**CONFEDERATED SALISH AND KOOTENAI TRIBES OF the FLATHEAD RESERVATION, MONTANA, et al., Plaintiffs-Appellants/Cross-Appellees,**

v.

**James M. NAMEN, et al., City of Polson, Montana, and State of Montana, Defendants-Appellees/Cross-Appellants.**

Nos. 80–3189, 80–3190, 80–3196, 80–3216 and 80–3274.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 8, 1981.

Decided Jan. 11, 1982.

Rehearing and Rehearing En Banc Denied March 10, 1982.

---

Martin W. Matzen, Dept. of Justice, Washington, D. C., argued, for the U. S.; Robert T. O'Leary, Billings, Mont., on brief.

Edward M. Fogarty, Wilkinson, Cragun & Barker, Washington, D. C., argued, for Confederated Salish and Kootenai; Richard A. Baenen, Washington, D. C., on brief.

Urban Roth, Poore, Roth, Robischon & Robinson, Butte, Mont., for State of Mont. and James M. Namen, et al.

F. L. Ingraham, Christian, McCurdy, Ingraham & Wold, Ronan, Mont., for City of Polson; Tom D. Tobin, Winner, S. D., William W. Shakely, Tobin Law Offices, P. C., Washington, D. C., on brief.

Before PREGERSON and POOLE, Circuit Judges, and KELLAM *, District Judge.

PREGERSON, Circuit Judge:

These consolidated appeals stem from attempts by the Confederated Salish & Kootenai Tribes of Flathead Reservation [hereinafter "the Tribes"] to regulate the manner in which non-Indians who own land bordering a navigable lake on the reservation exercise their riparian rights. The Tribes seek to enforce an ordinance they enacted in 1977 to regulate both existing and future structures on the bed and banks of the south half of Flathead Lake, to which the Tribes claim beneficial title. The Namens, who are non-Indian riparian landowners, the State of Montana, and the City of Polson, Montana, contest the Tribes' efforts.[1] They argue: (1) that the historic Flathead Reservation was terminated in 1904 ["the termination issue"]; (2) that, even if the original reservation still exists, title to the bed and banks of the south half of Flathead Lake is vested in Montana, not in the United States as trustee for the Tribes ["the ownership issue"]; and (3) that in any event the Tribes have no power to regulate how a non-member exercises his or her riparian rights ["the regulatory issue"].

The district court rejected the first two of these arguments, but concluded that the Tribes lacked regulatory authority over non-members. For the reasons set forth below, we affirm the district court's conclusions as to the termination and ownership issues, but reverse on the regulatory issue and hold that the Tribes have the authority to enact the challenged ordinance.

BACKGROUND

The Flathead Reservation was established by the 1855 Treaty of Hell Gate, 12 Stat. 975 (ratified in 1859), in what is now the State of Montana. As defined by the treaty, the reservation contained the southern half of Flathead Lake, a navigable body of water roughly 26 miles long and up to 5 miles wide.

The Act of April 23, 1904, ch. 1495, 33 Stat. 302 [hereinafter "the Flathead Act"], authorized allotments in severalty of Flathead Reservation land to members of the Tribes. The land remaining after allotment was to be made available by presidential proclamation to non-Indians. The Act was implemented by the Proclamation of May 22, 1909, 36 Stat. 2494, which—after a delay—became effective May 2, 1910. Pursuant to the new policy, a federal patent was issued in 1910 to Antoine Morais, a Flathead Indian, for an allotment of reservation land.

The Namens (James M., Barbara J., A. J., and Kathryn) are successors in interest to Morais. Their land is riparian to the south half of Flathead Lake. They operate a business called "Jim's Marina" on their land, and have built docks, a breakwater, and a storage shed that extend beyond the high-water mark of the lake onto its banks and bed. The State of Montana and the City of Polson [hereinafter "Polson"] also own land riparian to the south half of Flathead Lake on which are structures extending beyond the high-water mark.

In August 1973 the Tribes initiated the instant litigation by suing the Namens in federal District Court for the District of

---

* The Honorable Richard B. Kellam, Senior District Judge for the Eastern District of Virginia, sitting by designation.

1. For convenience, these parties will be referred to as "the appellees."

Montana. The Tribes sought declaratory and injunctive relief against the Namens for allegedly trespassing on tribal lands by building and maintaining their docks, breakwater, and storage shed. Polson intervened as a defendant.

The district court granted partial summary judgment for defendants in August 1974. *Confederated Salish & Kootenai Tribes v. Namen (Namen I)*, 380 F.Supp. 452 (D.Mont.1974), *aff'd*, 534 F.2d 1376 (9th Cir.), *cert. denied*, 429 U.S. 929, 97 S.Ct. 336, 50 L.Ed.2d 300 (1976). The district court held: (1) the Namens' title extends only to the high-water mark; (2) the bed and banks of the south half of Flathead Lake are held by the United States in trust for the Tribes; but (3) the Namens' title includes the federal common law rights of access and wharfage out to navigable water. The court reserved for later determination the question whether the Namens' structures exceeded what their rights authorized.

In November 1975 Polson filed suit against the Tribes for a declaratory judgment that the Flathead Reservation had been terminated by the 1904 Flathead Act. Montana intervened as a plaintiff. In June 1977 Polson's suit was consolidated with the Tribes' suit.

In July 1977 the Tribes enacted, and the Secretary of the Interior approved, a "Shoreline Protection Ordinance," Ordinance 64A, aimed at regulating riparian structures along the south half of Flathead Lake. In September 1977 the Tribes amended their complaint, adding allegations that the Namens' structures violated Ordinance 64A, abused the Namens' riparian rights, degraded water quality, and interfered with tribal fishing rights. The United States intervened as a plaintiff in October 1977.

In December 1977 the United States, as trustee for the Tribes, filed a separate lawsuit against Polson and Montana, seeking a declaratory judgment that the Flathead Reservation had not been terminated and that the Tribes had authority to regulate use of the bed and banks of the south half of the lake. That suit was consolidated with the other two.

The district court issued its written opinion on April 8, 1980. The court reaffirmed the conclusions it had reached in *Namen I* —particularly, that the United States held title to the south Flathead Lake bed in trust for the Tribes—and additionally held: (1) that there had been no diminishment or termination of the reservation; but (2) that the Tribes had no authority to regulate the riparian rights of the Namens, Polson, and Montana.

Each party has appealed from some aspect of the district court's judgment. The Namens (in 80–3189), Montana (in 80–3190), and Polson (in 80–3196) appeal from the rulings on the ownership issue (that the Tribes hold beneficial title to the south Flathead Lake bed) and the termination issue (that the reservation was never terminated). The Tribes (in 80–3216) and the United States (in 80–3274) appeal from the ruling on the regulatory issue (that the Tribes lack authority to regulate non-Indians' riparian rights).[2]

THE TERMINATION ISSUE

The Flathead Act of April 23, 1904, ch. 1495, 33 Stat. 302, provided for allotments of reservation land in severalty to the Indians on the Flathead Reservation and for opening the surplus, unallotted land to non-Indians. The City of Polson argues that this statute terminated the reservation status of the Flathead Reservation. The Namens and Montana adopt Polson's position. The district court, however, rejected this argument. We affirm this portion of the district court's judgment.

The crucial inquiry where, as here, it is alleged that a statute has terminated a reservation is whether Congress intended the statute to have that effect. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586, 97

---

**2.** The Tribes are also appealing the reaffirmance by the district court of its *Namen I* holding that the Namens and Polson have a federal common law right of access and wharfage, but do so merely to preserve the issue and have not argued that issue here.

S.Ct. 1361, 1363, 51 L.Ed.2d 660 (1977).[3] Termination cannot be inferred lightly, and Congress's intent to terminate must be clear to prevail in the face of the rule that ambiguities are resolved in the Indians' favor. *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975). "A congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973). Neither the face of the Flathead Act, nor its legislative history and the "surrounding circumstances," clearly indicate a congressional intent to terminate the Flathead Reservation.

### The face of the Act:

Statutes have expressed an intent to terminate all or part of a reservation in several different ways. Congress frequently made such an intent explicit.[4] On other occasions, Congress used the slightly less explicit "language of cession," by which an Indian tribe would agree to cede, convey, or relinquish all title to part or all of its reservation—language which the Supreme Court has described as "precisely suited" to terminate all of the tribe's interest in the affected land. *DeCoteau v. District County Court*, 420 U.S. 425, 445, 95 S.Ct. 1082, 1093, 43 L.Ed.2d 300 (1975) (tribe agreed to "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest" to the affected lands).[5] In still other situations, courts have found an intent to terminate implicit in statutory references to the "diminished reservation"[6] or to "reduction" of the reservation.[7]

The Flathead Act does not in any of these ways express on its face an intent to terminate the reservation. As the district court observed, it contains neither an explicit declaration that the reservation was terminated nor explicit language of cession. And, far from containing implicit expressions of an intent to terminate, the Flathead Act refers to the reservation without any indication that it is to be diminished or terminated. These references are quite similar to language in a slightly later statute that the Supreme Court said "makes it clear that the intention of Congress was that the reservation should continue to exist as such." *Seymour v. Superintendent*, 368 U.S. 351, 355, 82 S.Ct. 424, 427, 7 L.Ed.2d 346 (1962) (footnote omitted).[8] Polson is thus mistak

---

3. Reduction or termination of a reservation requires congressional action. *Mattz v. Arnett*, 412 U.S. 481, 504–05, 93 S.Ct. 2245, 2257–58, 37 L.Ed.2d 92 (1973).

4. *See, e.g.*, Act of July 27, 1868, ch. 248, 15 Stat. 198, 221 ("the Smith River reservation is hereby discontinued"); Act of July 1, 1892, ch. 140, 27 Stat. 62 ("the following described tract or portion of said Colville Reservation . . . is . . . vacated and restored to the public domain"); Act of April 21, 1904, ch. 1402, 33 Stat. 189, 218 ("the reservation lines of the said Ponca and Otoe and Missouria Indian reservations . . . are hereby, abolished").

5. *See also Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 597, 97 S.Ct. 1361, 1368, 43 L.Ed.2d 300 (1977) (Act of 1904 incorporated cession language whereby Indians agreed to "cede, surrender, grant, and convey to the United States all their claim, right, title, and interest" in affected land); *United States v. So. Pac. Transp. Co.*, 543 F.2d 676, 695 (9th Cir. 1976) (Indians agreed to "cede, grant and relinquish . . . all right, title and interest" in affected lands); *Ellis v. Page*, 351 F.2d 250 (10th Cir. 1965) (Indians agreed to "cede, convey, transfer, relinquish,

and surrender, forever and absolutely, . . . all their claim, right, title, and interest" in affected lands).

6. The Act of May 27, 1910, ch. 257, 36 Stat. 440, refers to "the diminished reservation" as well as to "the tract to be ceded." It was held to have diminished the Pine Ridge Reservation in *United States ex rel. Cook v. Parkinson*, 525 F.2d 120 (8th Cir. 1975), *cert. denied*, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977).

7. The Act of October 1, 1890, ch. 1271, 26 Stat. 658, was entitled "An Act to provide for the reduction of the Round Valley Indian Reservation . . . and for other purposes." Partly for this reason, it was held to have effected such a reduction. *Russ v. Wilkins*, 624 F.2d 914 (9th Cir. 1980), *cert. denied*, 451 U.S. 908, 101 S.Ct. 1976, 68 L.Ed.2d 296 (1981).

8. *Seymour* involved the Act of March 22, 1906, ch. 1126, 34 Stat. 80, which opened to non-Indian settlement the unallotted lands of the "diminished Colville Reservation" (so-called because the original reservation had been diminished in 1892). Compare, for example, § 2 of

en in contending that the language of the Flathead Act does not differ materially from that of statutes that have been held to diminish or terminate reservations.[9]

Polson also contends that certain specific provisions of the Flathead Act suggest an intent to terminate reservation status. One is section 8, granting two sections out of every township in the surplus lands to Montana for school purposes. The other is section 21, added by a 1909 amendment to the Act,[10] extending the federal ban on liquor in Indian country to the surplus lands of the reservation. It is true that similar provisions were held in *Rosebud, supra*, 430 U.S. at 611–14, 97 S.Ct. at 1375–76, to support a finding of intent to disestablish the affected lands. But the presence of such provisions at best supports a finding reached on other grounds, and is by no means dispositive. Several statutes that contain such school lands and intoxicants provisions have been held *not* to effect any termination of reservation status.[11]

## The legislative history:

The legislative history of the Flathead Act, as the district court noted, is "sparse" and "equivocal." The court did, however, emphasize a change made at the behest of the Secretary of the Interior. In the earliest version of what eventually became the Act, section 8 spoke of giving certain Indians substitute lands "in the tract herein ceded." This was changed, in the statute finally enacted, to "in the tract under consideration" because, as the Secretary explained, the Tribes had not agreed to a cession and none was contemplated. The change strongly suggests congressional recognition that reservation lands were not being ceded, and hence that reservation status was not being terminated.

Polson urges us to assume that the Flathead Act expressed the same congressional policy and underlying purpose as three other statutes that were enacted within the same week to open all or part of three other

---

the 1906 act ("as soon as the lands embraced within the diminished Colville Indian Reservation shall have been surveyed, the Secretary . . . shall cause allotments of the same to be made") with § 2 of the Flathead Act ("so soon as all of the lands embraced within said Flathead Indian Reservation shall have been surveyed, the Commissioner . . . shall cause allotments of the same to be made"), and compare § 6 of the 1906 act (proceeds "shall be . . . deposited . . . to the credit of the . . . tribes of Indians belonging and having tribal rights on the Colville Indian Reservation") with § 14 of the Flathead Act (half of proceeds to be "paid to the said Indians and such persons having tribal rights on the reservation").

9. The examples Polson gives either do differ materially from the Flathead Act or are otherwise distinguishable. The 1910 Pine Ridge Act [Act of May 27, 1910, ch. 257, 36 Stat. 440] refers to "the diminished reservation"; the 1890 Round Valley Act [Act of October 1, 1890, ch. 1271, 26 Stat. 658] is titled in part "An Act to provide for the reduction of the Round Valley Indian Reservation"; and the 1908 Cheyenne River Act [Act of May 29, 1908, ch. 218, 35 Stat. 460] speaks of "the respective reservations thus diminished." Furthermore, this last statute was explicitly held *not* to diminish the reservation in *United States ex rel. Condon v. Erickson*, 478 F.2d 684 (8th Cir. 1973). The 1907 and 1910 acts [Act of March 2, 1907, ch. 2536, 34 Stat. 1230; Act of May 30, 1910, ch. 260, 36 Stat. 448] interpreted in *Rosebud Sioux*

*Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 43 L.Ed.2d 300 (1977), though not themselves materially different from the Flathead Act, were held to diminish the Rosebud Reservation only because of their perceived relationship to an earlier statute [Act of April 23, 1904, ch. 1484, 33 Stat. 254] that contained explicit language of cession.

10. Act of March 3, 1909, ch. 263, 35 Stat. 781, 795–96.

11. The Act of March 22, 1906, ch. 1126, 34 Stat. 80, contains an intoxicants provision (§ 13, added by Act of August 31, 1916, ch. 424, 39 Stat. 672), yet effected no termination. *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). The Act of February 14, 1913, ch. 54, 37 Stat. 675, contains a school lands provision (§ 7) and an intoxicants provision (§ 8), yet effected no termination. *United States v. Long Elk*, 565 F.2d 1032 (8th Cir. 1977). The Act of May 29, 1908, ch. 218, 35 Stat. 460, contains a school lands provision (in § 1) and an intoxicants provision (added to § 8 by Act of February 17, 1910, ch. 40, 36 Stat. 196), yet effected no termination. *United States ex rel. Condon v. Erickson*, 478 F.2d 684 (8th Cir. 1973). The Act of June 1, 1910, ch. 264, 36 Stat. 455, contains a school lands provision (§ 8) and an intoxicants provision (§ 13), yet effected no termination. *City of New Town v. United States*, 454 F.2d 121 (8th Cir. 1972).

reservations.[12] Two of these statutes have been held to terminate the reservation status of the areas involved.[13] This argument, however, overlooks salient differences between the Flathead Act and the other three statutes. All of the others purported to amend and ratify agreements previously negotiated with the affected Indians; they incorporated the text of those prior agreements; and they each contained explicit language of cession. The Flathead Act does not purport to modify a prior cession agreement, since the Tribes had refused to make such an agreement. It contains no language of cession, but merely provides that after allotments to the Indians, the unallotted surplus "shall be disposed of under the general provisions of the homestead, mineral, and town-site laws of the United States." Flathead Act, § 8. Statutes couched in similar language have been held *not* to terminate reservation status.[14]

*The surrounding circumstances:*

Finally, Polson appeals to three "surrounding circumstances": the general federal policy prevailing at the time the Flathead Act was passed; negotiations that occurred a few years before its passage; and

subsequent legislative and administrative actions. None of these does much to bolster Polson's position.

(1) Polson first argues that federal policy as of 1904 was to diminish and abolish existing reservations. Considered as a whole, however, the evidence Polson adduces establishes only a turn-of-the-century federal policy of allotting reservation land to the Indians in severalty and opening the surplus land to non-Indian settlement.[15] This is not the same as, nor does it imply, a policy of immediately terminating existing reservations. "Although the ultimate aim of the general policy of allotment was the abolition of Indian reservations, a reservation was not necessarily terminated or diminished by the first step of allotment and sale of surplus lands." *United States v. Southern Pacific Transportation Co.*, 543 F.2d 676, 695 (9th Cir. 1976); *accord, Rosebud, supra*, 430 U.S. at 586–87, 97 S.Ct. at 1362–63; *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975).

Moreover, the existence of a general federal policy of ultimately abolishing reservations would do little to establish that the Flathead Act was specifically intended to

12. The others are the Act of April 23, 1904, ch. 1484, 33 Stat. 254 [Rosebud Act]; Act of April 27, 1904, ch. 1620, 33 Stat. 319 [Devils Lake Act]; Act of April 27, 1904, ch. 1624, 33 Stat. 352 [Crow Act].

13. The Rosebud Act terminated the reservation status of a portion of the Rosebud Sioux Reservation. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). The Crow Act terminated a portion of the Crow Reservation. *Hawkins v. Crist*, No. CV 76–99–BLG (D.Mont. January 27, 1978).

14. The Act of June 17, 1892, ch. 120, 27 Stat. 52, declared the Klamath River Reservation "to be subject to settlement, entry, and purchase under the laws of the United States granting homestead rights and authorizing the sale of mineral, stone, and timber lands." It did not terminate the reservation. *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). The Act of March 22, 1906, ch. 1126, § 3, 34 Stat. 80, provided that after classification and appraisal, the unallotted portion of the Colville Reservation "shall be open to settlement and entry under the provisions of the homestead laws." It did not terminate the reservation. *Seymour v. Superintendent*, 368 U.S. 351, 82

S.Ct. 424, 7 L.Ed.2d 346 (1962). The Act of February 14, 1913, ch. 54, 37 Stat. 675, stated that the surplus land of the Standing Rock Reservation "shall be disposed of by proclamation under the general provisions of the homestead and town-site laws of the United States, and shall be opened to settlement and entry." It did not terminate any reservation land. *United States v. Long Elk*, 565 F.2d 1032 (8th Cir. 1977).

15. Polson's evidence for a policy of outright termination of reservations, as opposed to mere allotments and openings, is rather scanty. All of the more explicit declarations of hostility to the reservation system (contained in the 1889, 1890, 1891, and 1892 Reports of the Commissioner of Indian Affairs) were written by a single individual—Thomas J. Morgan, Commissioner of Indian Affairs under Benjamin Harrison (1889–93). After Harrison was succeeded by Grover Cleveland, the new Interior Secretary, Hoke Smith, expressed doubts about the previous administration's desire to dissolve the reservations as quickly as possible. *See* [1894] Sec'y of the Interior Annual Report III.

terminate the Flathead Reservation. Many statutes contemporaneous with the Flathead Act, and thus presumably passed while the same overall policy was in force, have been held not to effect any termination.[16]

(2) Polson next discusses the negotiations carried on with the Tribes between 1897 and 1901, pursuant to congressional authorization (Act of June 10, 1896, ch. 398, 29 Stat. 321, 341). These negotiations failed to induce the Tribes to cede a portion of their reservation to the United States. Polson argues, however, that the intent to terminate the reservation which Congress exhibited when it authorized the negotiations was subsequently carried out *unilaterally* in the Flathead Act.

This is an unjustified extension of the reasoning of *Rosebud, supra*. That case involved a 1904 statute that explicitly incorporated, and purported to amend and ratify, a 1901 cession agreement with the Rosebud Sioux tribe. The Court based its conclusion that Congress intended the 1904 statute to diminish the Rosebud Reservation on this explicit link to the prior cession agreement. By contrast, there was no prior cession agreement whatsoever for the Flathead Act to ratify, and it is mere speculation to suppose that Congress in 1904 must have intended to effect a termination sim-

ply because it had sought to negotiate one several years earlier.[17]

Indeed, the materials Polson cites reveal that the 1897–1901 negotiations aimed at results different from those subsequently achieved by the Flathead Act. The negotiations sought cession of *portions* of the Flathead Reservation.[18] The 1904 Act opened to settlement *all* unallotted reservation land, not merely a portion; it used no language of cession; and it provided for payment to the Indians of uncertain future proceeds from disposal of the affected lands, rather than a fixed sum, as contemplated in the earlier negotiations.[19] These differences make it difficult to be confident that Congress intended the 1904 Act to terminate the reservation.[20] Certainly we have been shown no statements by congressional proponents of the Flathead Act that the bill was designed to effect the termination Congress had sought to achieve by cession in the earlier negotiations.

(3) Finally, Polson seeks to support its claim that the Flathead Act was intended to terminate the reservation by looking at subsequent legislative and administrative action. Specifically, Polson points to three factors: the "jurisdictional history" of the Flathead Reservation after 1904; the pronouncements of Interior Department offi-

---

**16.** Notes 11 and 14 *supra* cite a total of five such statutes enacted between 1892 and 1913.

**17.** Such speculation is impermissible since, as mentioned earlier, ambiguities must be resolved in the Indians' favor and the intent to terminate must be clear. *DeCoteau, supra*, 420 U.S. at 444, 95 S.Ct. at 1092. Moreover, an extension of *Rosebud* seems particularly ill-advised where, as here, what is at stake is termination of an entire reservation rather than, as in *Rosebud*, mere diminishment. *Rosebud, supra*, 430 U.S. at 599 n.20, 616 n.48, 97 S.Ct. at 1369 n.20, 1377 n.48.

**18.** *See* Act of June 10, 1896, ch. 398, 29 Stat. 321, 341; Instructions to Commissioners from Acting Commissioner of Indian Affairs at 12 (Aug. 31, 1896) (Tribes "might be willing to enter into an agreement to cede a portion of their reserve"); Polson's Opening Brief at 18 (quoting 1899 Report of Flathead Indian Agent).

**19.** The district court explained that until 1901 the negotiators repeatedly offered the Tribes "a

lump sum price," although in their last offer they suggested the Indians sell the land themselves, with the government to purchase the unsold surplus after ten years.

The changed method of payment in the Flathead Act is not by itself proof that no termination was intended. *Rosebud, supra*, 430 U.S. at 598 n. 20, 97 S.Ct. at 1369 n. 20 (1977). It is, however, one factor pointing against termination. *DeCoteau, supra*, 420 U.S. at 448, 95 S.Ct. at 1094.

**20.** For example, the 1892 statute opening the Klamath River Reservation to non-Indians had been preceded by more than a decade of unsuccessful congressional efforts to terminate the reservation. Yet the Supreme Court held that this history did not establish that the 1892 act embodied an intent to terminate, in view of the differences between the earlier proposals and the final act. *Mattz v. Arnett*, 412 U.S. 481, 499–504, 93 S.Ct. 2245, 2255, 37 L.Ed.2d 92 (1973).

cials; and subsequent congressional legislation.

The "jurisdictional history" of disputed land—i.e., whether the state or the federal government exercised authority there—supported termination in *Rosebud, supra,* and *DeCoteau, supra.* In *Rosebud,* the state had apparently exercised jurisdiction over the lands in question ever since enactment of the relevant statutes. 430 U.S. at 603–04 & n.27, 97 S.Ct. at 1371–72 & n.27. In *DeCoteau,* the state exercised jurisdiction over the disputed lands until the federal Court of Appeals ruled otherwise. 420 U.S. at 449, 95 S.Ct. at 1095. The situation in the instant case is quite different. The Montana Supreme Court ruled thirty years ago that the state had no jurisdiction over major crimes on the Flathead Reservation. *State ex rel. Irvine v. District Court,* 125 Mont. 398, 239 P.2d 272 (1951). Eight years ago the Montana Supreme Court held that the state had no jurisdiction over a civil dispute involving a commercial transaction between an Indian and a non-Indian "at Polson, Montana, located within the exterior boundaries of the Flathead Indian Reservation." *Security State Bank v. Pierre,* 162 Mont. 298, 511 P.2d 325, 326 (1973). Thus the instant case simply does not involve the kind of unquestioned state assertion of authority over the disputed lands that helped sway the Court in *Rosebud* and *DeCoteau.*[21]

Polson dwells at length on statements by officials of the Interior Department that indicate their belief that Flathead Reservation was terminated. The district court noted, however, that *both* sides adduced "innumerable documents from governmental agencies" that supported their conflicting positions. For example, there is the Presidential Proclamation that formally announced the opening of the reservation to non-Indian settlement. In *Rosebud, supra,* the Proclamation opening the land affected by the 1904 statute at issue there was accorded great weight: it contained emphatic language of cession which the Court called an "unambiguous, contemporaneous, statement, by the Nation's Chief Executive, of a perceived disestablishment." 430 U.S. at 602–03, 97 S.Ct. at 1371. The Proclamation opening the Flathead Reservation, by contrast, contains no such statement.[22] Indeed, section 1 of the Proclamation speaks of would-be settlers submitting applications "for lands in any or all of said Reservations"—*not* "former Reservations"—and there are similar references in sections 5 and 8. This seems to manifest a contemporary perception that the reservation had not been terminated.

The Tribes enumerate other administrative acts and statements that contradict those adduced by Polson and indicate a perception of Flathead Reservation as still in existence. Actions and utterances of federal officers that manifest no single clear perception of the reservation's status can hardly be treated as a significant item in determining that status. *See City of*

---

**21.** Indeed, the Tribes list thirty-two published decisions of various courts that recognize the continued existence of the reservation. Polson responds that in most of these decisions the issue of reservation status was not relevant to the holding, while in the remaining ones reservation status was not disputed and the effect of the Flathead Act on that status was not considered. This response is irrelevant because the Tribes have not sought to invoke the doctrine of *stare decisis.* The repeated judicial recognition of the reservation's continued existence is simply evidence that the 1904 Act was not authoritatively treated as having terminated the reservation. As such it is a perfectly relevant piece of "jurisdictional history." In addition to the Montana Supreme Court holdings described above, the most persuasive opinion, considered as evidence of how the reservation's status was viewed, is *Moe v. Confederat-*

*ed Salish & Kootenai Tribes,* 425 U.S. 463, 466–67, 96 S.Ct. 1634, 1638, 48 L.Ed.2d 96 (1976), where the Supreme Court described the Flathead Reservation as having its 1855 boundaries.

**22.** The Proclamation begins:

I, William Howard Taft, President ... do hereby prescribe, proclaim and make known that all the nonmineral, unreserved lands classified as agricultural lands of the first class, agricultural lands of the second class and grazing lands within the Flathead Indian Reservation ... shall be disposed of under the provisions of the homestead laws of the United States ... and be opened to settlement and entry in the following manner ....
Proclamation of May 22, 1909, 36 Stat. 2494.

*New Town v. United States*, 454 F.2d 121, 125–26 (8th Cir. 1972).

Finally, Polson refers to congressional actions after 1904—such as bills that referred to the "former" Flathead Reservation—as demonstrating that Congress believed the reservation to have been terminated. Such evidence of legislative intent is at best dubious, however: though "not always without significance," "subsequent legislation usually is not entitled to much weight in construing earlier statutes." *Mattz v. Arnett*, 412 U.S. 481, 505 n.25, 93 S.Ct. 2245, 2258 n.25, 37 L.Ed.2d 92 (1973). Moreover, the Tribes list *seventy-two* statutes enacted between 1905 and 1949 that refer to the Flathead Reservation as still existing, rather than as a "former" reservation. Polson's response—that all of these references "were nothing more than convenient geographical designations"—is unconvincing.[23] Polson has cited only *two* statutes that refer to the "former" reservation,[24] plus a third that refers (admittedly incorrectly) to the "ceded lands" of the reservation.[25] The other congressional materials it cites are unsuccessful bills.

In summary, neither the post-1904 "jurisdictional history" of Flathead Reservation nor subsequent congressional and administrative statements and actions demonstrate that Congress intended the 1904 Flathead Act to terminate the reservation.

Since neither the Act on its face nor the surrounding circumstances and legislative history make it clear that Congress intended to terminate the Flathead Reservation, we affirm the district court's finding that there has been no such termination.

## THE OWNERSHIP ISSUE

This circuit decided the ownership issue forty years ago, ruling that the United States holds title to the bed and banks of the south half of Flathead Lake in trust for the Tribes. *Montana Power Co. v. Rochester*, 127 F.2d 189, 191 (9th Cir. 1942). Other courts over the years have agreed. *See, e. g., Montana Power Co. v. FPC*, 459 F.2d 863, 865 (D.C.Cir.), *cert. denied*, 408 U.S. 930, 92 S.Ct. 2497, 33 L.Ed.2d 343 (1972). The *Rochester* holding was explicitly endorsed by the district court in *United States v. Pollmann*, 364 F.Supp. 995, 999 (D.Mont. 1973), over the objection that *United States v. Holt State Bank*, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926), dictates a contrary conclusion—an objection which the appellees renew here. It was again endorsed by the district court in *Namen I*, 380 F.Supp. at 457.

■ Our *Rochester* holding is thus strongly supported by *stare decisis*. That doctrine applies with special force to decisions affecting title to land. *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 381, 97 S.Ct. 582, 592, 50 L.Ed.2d 550 (1977); *United States v. Title Insurance & Trust Co.*, 265 U.S. 472, 486–87, 44 S.Ct. 621, 623, 68 L.Ed. 1110 (1924). The reason for this is the special reliance that these decisions command—they "become rules of property, and many titles may be injuriously affected by their change." *Minnesota Co. v. National Co.*, 3 Wall. 332, 70 U.S. 332, 334, 18 L.Ed. 42 (1866).

Such reliance has in fact been placed on the "rule" that the bed of the south half of Flathead Lake is beneficially owned by the Tribes. Hydroelectric power development on the Flathead Reservation has proceeded for half a century on the assumption that the Tribes own the south half of the lake. The Kerr hydroelectric project was constructed on reservation land pursuant to a

---

**23.** Polson also argues that many of the statutes the Tribes cite were enacted either before May 1910, when the Flathead Reservation opening took effect, or after restorations of land to reservation status pursuant to the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984, the first of which occurred in 1936. Even if this argument is valid, there are still thirty-eight statutes that refer to the Flathead Reser-

vation as existing and yet were enacted during the period when, according to Polson, that reservation had been terminated.

**24.** Act of July 17, 1914, ch. 143, 38 Stat. 510; Act of February 14, 1920, ch. 75, 41 Stat. 408, 421.

**25.** Act of May 31, 1906, ch. 2567, 34 Stat. 205.

license issued in 1930. The rental payments which the project's owner (now the Montana Power Company) has been required to make have included substantial sums, aggregating several million dollars, for use of the south half of the lake.[26]

Appellees nevertheless contend that *Rochester* is no longer good law in light of *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). In *Montana*, the Supreme Court held that the treaty establishing the Crow Indian Reservation had not conveyed to the Indians beneficial ownership of the bed of the Big Horn River, which flows through the reservation. Instead, title to the river bed had "passed to the State of Montana upon its admission into the Union." *Id.* 101 S.Ct. at 1254. Appellees contend that the *Montana* holding is controlling here and compels the con-

clusion that, contrary to this court's decision in *Rochester*, the Hell Gate Treaty did not convey beneficial ownership of the south half of Flathead Lake to the Tribes. We do not agree.

■ In *Montana*, the Supreme Court emphasized that although the United States has the power to convey lands under a navigable waterway in a territory, thus defeating the title of the future state, there is a "strong presumption" against such a conveyance. 101 S.Ct. at 1251.[27] The Court held that the 1868 treaty with the Crow Tribe contained no language strong enough to overcome this presumption: "The treaty in no way expressly referred to the riverbed, . . ., nor was an intention to convey the riverbed expressed in 'clear and special words,' . . ., or 'definitely declared or other-

**26.** Appellees seek to minimize the significance of the lake bed as a factor in these rental payments, arguing that most of the revenue the Tribes have received for the Kerr Dam site is compensation for the value of the power site itself, rather than for the use of the lake bed.

Nevertheless, the Tribes have received substantial revenue from their lakebed interest. In *Montana Power Co. v. FPC*, 459 F.2d 863, 871–72 (D.C.Cir.), *cert. denied*, 408 U.S. 930, 92 S.Ct. 2497, 33 L.Ed.2d 343 (1972), Montana Power was required to pay the Tribes an annual rent of $950,000, or 42.13% of the value of the Kerr project. In computing that figure, the FPC had assigned 8% of the project's value to the Tribes as rent for the lake bed. That means that 18% (8/42.13) of the annual rental payments, or $171,000, was rent for the lake bed. This is not an inconsiderable sum, and since these payments were made from 1959 through 1974, they added up to well over $2.5 million. Since 1975, the annual rent to the Tribes has been $2.6 million. If the lake bed rental makes up the same proportion of these current rents, then ownership of the south half of the lake is now worth $468,000 per year to the Tribes.

**27.** The *Montana* Court emphasized that "Congress was, of course, aware of this presumption once it was established by this Court." 101 S.Ct. at 1251 n.2. There is no evidence, however, that the presumption against pre-statehood federal grants of land under navigable waters had been established at the time the Hell Gate treaty was negotiated and ratified. The earliest statement of the presumption appeared seven decades later: "[D]isposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was

definitely declared or otherwise made very plain." *United States v. Holt State Bank*, 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926).

Earlier cases that appellees cite do not articulate any presumption concerning federal grants of land under navigable waters *before* a state is admitted to the Union. That presumption is said to flow from the "equal footing doctrine" —that new states enter the Union on an equal footing with the original states, all of which entered the Union owning the land under navigable waters within their borders. But *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845), generally regarded as the source of the equal footing doctrine, dealt with a purported federal grant of land years *after* Alabama had been admitted to the Union. And *Martin v. Waddell*, 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842), cited for the proposition that ownership of the land under navigable waters is an incident of sovereignty, involved land in one of the original thirteen states. The case required "clear and especial words" in a patent by the English Crown to a private individual because such a patent would transform a portion of the public domain into the individual's private property. *Id.* at 411. The requirement was explicitly characterized as dictum. *Id.* Moreover, the underlying rationale for this requirement is of doubtful relevance to a reservation of land by a sovereign Indian tribe. Such a reservation does not, properly speaking, involve a "grant" of public land. *See Confederated Salish and Kootenai Tribes v. United States*, 437 F.2d 458, 468 n.29 (Ct.Cl.1971). Nor does it convert public domain into an individual's private property.

wise made plain.'" *Id.* at 1252 (citations omitted).

 By contrast, the Hell Gate Treaty *did* expressly refer to Flathead Lake—in fact, it referred to the lake in defining the boundaries of the reservation. The northern boundary was to run from "a point due west from the point halfway in latitude between the northern and southern extremities of the Flathead Lake; thence on a due east course to the divide . . . ." Treaty of July 16, 1855, 12 Stat. 975, Article II. It would have been pointless, and quite likely deceptive, to have the northern boundary of the reservation bisect Flathead Lake unless it was intended to convey title to the southern half of that lake to the Indians.[28] Certainly the most natural and intelligible way of understanding the boundary description is to infer an intent to convey the southern lake bed. This natural interpretation should be adopted, in view of the Supreme Court's very frequent admonitions that doubtful language in Indian treaties must be construed in favor of the Indians and given the sense the Indians would have understood it to convey. *See, e. g., Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675–76, 99 S.Ct. 3055, 3069–70, 61 L.Ed.2d 823 (1979); *DeCoteau v. District County Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975); *Antoine v. Washington,* 420 U.S. 194, 199–200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1975); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973); *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 630–31, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970).[29]

There is a further distinction between *Montana* and the instant case. The *Montana* Court supported its conclusion—that

title to the bed of the Big Horn River had not been granted to the Crow Tribe—by reasoning that "the situation of the Crow Indians at the time of the treaties presented no 'public exigency' which would have required" a departure from the federal policy of reserving ownership of the land under navigable waters for the future states. 101 S.Ct. at 1253. No exigency existed because "fishing was not important to [the Crows'] diet or way of life." *Id.* By contrast, the Kootenai Indians, one of the Tribes, depended heavily on fishing. Moreover, the urgency with which the Office of Indian Affairs pressed the dilatory Senate to ratify the Hell Gate and related treaties demonstrates that securing the Indians' assent to the opening of large areas of the then Washington Territory to American settlement was perceived as a "public exigency" in the 1850's.

Thus both the language of the treaty involved in this case and the circumstances surrounding its negotiation differ from what was found decisive in *Montana v. United States, supra.* Given the factors, discussed above, that entitle the *Rochester* holding to more than usual precedential force, we adhere to that holding and affirm that the bed of the south half of Flathead Lake is owned by the United States in trust for the Tribes.

### THE REGULATORY ISSUE

 The district court concluded that the Tribes had no power to regulate the federal common law riparian rights of non-Indians who own reservation land bordering the south half of Flathead Lake. The court's rationale was that "Indian tribes no longer retain those sovereign powers the exercise of which is inconsistent with their dependent status," namely "those which involve

---

**28.** Had Congress intended *not* to convey the southern half of the lake to the Indians, it could easily have defined the Reservation's northern boundary, upon reaching the west shore of the lake, as running along the shore of the southern half of Flathead Lake.

**29.** *Montana,* to be sure, established that this rule of construction favoring the Indians does not mean that the countervailing presumption

against federal grants of land under navigable waters in the territories is nullified whenever Indian reservations are involved. 101 S.Ct. at 1265 (Stevens, J., concurring). Yet the pro-Indian rule of construction should certainly *weaken* that presumption—especially where, as here, the controlling treaty was negotiated and ratified long before the presumption crystallized. *See* note 27 *supra.*

the relations between an Indian tribe and non-members of the tribe," and hence that the opening of the reservation to settlement by non-Indians had "implicitly divested" the Tribes of regulatory authority over non-Indians.

This rationale was derived from two Supreme Court cases decided in March 1978: *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), and *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). In *Oliphant*, the Supreme Court acknowledged that "Indian tribes do retain elements of 'quasi-sovereign' authority," but explained that "the tribes' retained powers are not ... limited only by specific restrictions in treaties or congressional enactments.... [T]ribes are prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress *and* those powers '*inconsistent with their status.*'" *Id.* at 208 (citation omitted) (emphasis in original). In *Wheeler*, the Court added that "[t]he areas ·in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe." 435 U.S. at 326, 98 S.Ct. at 1087.

Two years later the Supreme Court appeared to recede from the *Oliphant/Wheeler* view that a tribe's dependent status works an "implicit divestiture" of certain tribal powers. The Court said: "Tribal powers are not implicitly divested by virtue of the tribes' dependent status." *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 153, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980). Rather, divestiture is found "in cases where the exercise of tribal sovereignty would be inconsistent with the overriding interests of

the National Government." *Id.* Nine months later, however, in *Montana v. United States*, 450 U.S. 544, 564, 101 S.Ct. 1245, 1257, 67 L.Ed.2d 493 (1981), the Court cited *Wheeler* approvingly for its statement that the dependent status of Indian tribes had implicitly divested them of powers over relations with non-Indians, and said that "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express Congressional delegation."

It is not clear whether the *Montana* rule (divestiture of powers not needed for tribal self-government or internal control) is meant to supersede that of *Colville* (divestiture of powers inimical to overriding federal interests). *Montana* nowhere explicitly rejects *Colville* or acknowledges the apparent tension between the criteria employed in the two cases. Moreover, the *Montana* Court drew its rule from *Wheeler* and *Oliphant*, where the Court used "overriding federal interests" reasoning to explain why divestiture should occur: "Upon incorporation into the territory of the United States, the Indian tribes thereby come under the territorial sovereignty of the United States and their exercise of separate power is constrained *so as not to conflict with the interests of this overriding sovereignty.*" *Oliphant, supra*, 435 U.S. at 209, 98 S.Ct. at 1021 (emphasis added).

If the *Colville* rule—divestiture of only those powers inconsistent with overriding federal interests—is applied in the instant case, the Tribes must prevail on the regulatory issue, because no significant federal interests would be impaired by tribal regulation of the riparian rights of non-Indian landowners on the Flathead Reservation.[30]

---

**30.** Appellees suggest two such interests: preventing intrusions on the non-Indians' personal liberties, and fulfilling the "justifiable expectations" of the non-Indians. The first alleged interest is too broad and vague—it would seem to rule out *any* exercise by Indians of civil or regulatory jurisdiction over non-Indians, yet some such exercises have been approved. *See, e. g., Colville, supra* (Indians can tax cigarette

sales to non-Indians on the reservation); *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) (tribal courts have exclusive jurisdiction over non-Indian's action for money for goods sold to Indians on the reservation). The second asserted interest—protecting non-Indians' expectations—also seems weak. It may well be that non-Indians who acquired land inside the reservation never expected to be

Indeed, the United States itself entered this lawsuit on the side of the Tribes, contending not only that no federal interest would be injured by the challenged tribal regulation but that the regulation would in fact advance federal anti-pollution efforts. The challenged ordinance was approved by the Secretary of the Interior in July 1977: the Secretary's letter commends the Tribes' action and "fully endorses the motivation behind the creation of the Ordinance."

Even if the *Montana* rule—divestiture of all powers not necessary "to protect tribal self-government or to control internal relations"—is applied to the instant case, we believe that the Tribes should prevail on the regulatory issue. We reach this conclusion for two distinct reasons.

First, the *Montana* Court explicitly affirmed this circuit's holding that the Crow Tribe had the power to "prohibit non-members from hunting or fishing on land belonging to the Tribe *or held by the United States in trust for the Tribe*," or to regulate such hunting and fishing if it permitted those activities. 101 S.Ct. at 1254 (emphasis added). In the instant case, the Tribes are in effect seeking to regulate non-Indians' use of tribal trust land, since the exer-

cise by appellees of their riparian rights entails building wharves, breakwaters, and other structures out onto the bed and banks of the south half of Flathead Lake.

Second, the *Montana* Court acknowledged certain exceptions to the general rule that tribes were divested of powers not necessary for self-government or internal relations. In particular, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 101 S.Ct. at 1258. The conduct that the Tribes seek to regulate in the instant case—generally speaking, the use of the bed and banks of the south half of Flathead Lake—has the potential for significantly affecting the economy, welfare, and health of the Tribes. Such conduct, if unregulated, could increase water pollution, damage the ecology of the lake, interfere with treaty fishing rights, or otherwise harm the lake, which is one of the most important tribal resources. Hence the challenged ordinance falls squarely within the exception recognized in *Montana*.[31]

subjected to regulation by the Indians. But likewise the Indians themselves never expected, when the Hell Gate Treaty set aside the Flathead Reservation "for the[ir] exclusive use and benefit" and barred non-Indians from living there without Indian assent, that reservation land opened without their consent to non-Indians would be removed from their jurisdiction. The Indians' expectations rest on the explicit guarantees of a treaty signed by the President and Secretary of State and ratified by the Senate. The non-Indians' expectations rest not on explicit statutory language, but on what is presumed to have been the intent underlying the allotment acts—a policy of destroying tribal government to assimilate the Indians into American society. It is difficult to see why there should be an overriding federal interest in vindicating only the latter expectations—especially when the anti-tribal policy on which they rest was repudiated over fifty years ago. *See Mattz v. Arnett*, 412 U.S. 481, 496 n.18, 93 S.Ct. 2245, 2254 n.18, 37 L.Ed.2d 92 (1973); *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151–52, 93 S.Ct. 1267, 1271–72, 36 L.Ed.2d 114 (1973).

31. Appellees, in addition to arguing that the Tribes have lost their inherent sovereign power

to regulate non-Indians' use of tribal land, also argue that Ordinance 64A violates the due process and equal protection guarantees of the fifth amendment because it was enacted by a jurisdiction in which they, as non-Indians, have no participation.

The general rule, however, is that the Bill of Rights cannot be invoked against tribal actions unless Congress has explicitly so provided. *See Talton v. Mayes*, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896); *Groundhog v. Keeler*, 442 F.2d 674, 678 (10th Cir. 1971); *Martinez v. Southern Ute Tribe*, 249 F.2d 915, 919 (10th Cir. 1957), *cert. denied*, 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067 (1958). Congress in 1968 did impose most provisions of the Bill of Rights—including due process and equal protection—on Indian tribes by the Indian Civil Rights Act, 25 U.S.C. §§ 1301–41. But the Supreme Court held in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), that habeas corpus is the exclusive remedy by which enforcement of that Act can be obtained in federal court. Hence appellees cannot raise their fifth amendment claims here.

Moreover, in *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706

For the reasons just discussed, we reverse the judgment of the district court on the regulatory issue and hold that the Tribes have the authority to apply Ordinance 64A to regulate the riparian rights of non-Indians owning land within the Flathead Reservation.

AFFIRMED in part, REVERSED in part, and REMANDED.

(1975), the Court rejected the argument that an Indian tribe cannot subject non-members to tribal ordinances. It is true that in *Mazurie* the power to enact the ordinance was delegated by Congress, whereas in the instant case the power is an inherent component of the limited sovereignty enjoyed by the Tribes. But the source of the power is not relevant in considering appellees' argument that the fact that they do not belong to the Tribes is in itself sufficient to make it unconstitutional to apply Ordinance 64A to them.