**CONFEDERATED SALISH AND KOOTENAI TRIBES OF THE FLATHEAD INDIAN RESERVATION, Plaintiff,**

v.

**STATE OF MONTANA and K.L. Cool, Director, Department of Fish, Wildlife and Parks, Defendants.**

**No. CV 90–49–M–CCL.**

United States District Court, D. Montana, Missoula Division.

May 11, 1990.

Daniel F. Decker, John B. Carter, Tribal Legal Dept., Confederated Salish & Kootenai Tribes, Pablo, Mont., James Goetz, Goetz, Madden & Dunn, Bozeman, Mont., for plaintiffs.

Clay Smith, Office of Atty. Gen., Robert Lane, Helena, Mont., Urban L. Roth, Poore, Roth & Robinson, Butte, Mont., Daniel Hoven and Jon Matropoulos, Browning, Kalexzyc, Berry & Hoven, Helena, Mont., for defendants.

## MEMORANDUM AND ORDER

LOVELL, District Judge.

Plaintiff filed this suit seeking declaratory judgment that the State of Montana (State) has no authority to regulate hunting and fishing on the Flathead Indian Reservation (Reservation), and that regulation of hunting and fishing within the exterior boundaries of the Reservation is exclusively vested in the Confederated Salish and Kootenai Tribes of the Flathead Indian Reservation (Tribes or Indians). The Tribes also seek a permanent injunction prohibiting the State from enforcing its hunting and fishing regulations on the Reservation, and a preliminary injunction prohibiting enforcement of State fishing regulations on the Reservation during the pendency of this action.

The court held a hearing May 3, 1990, on the motion for preliminary injunction and, having carefully studied the extremely difficult and important issues presented, is now prepared to rule.

In order to prevail on a motion for preliminary injunction within the Ninth Circuit, the moving party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor. *Joint Board of Control of Flathead, Mission and Jocko Irrigation District v. United States*, 646 F.Supp. 410 (D.Mont.1986); *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980). "Where a party can show a strong chance of success on the merits, he need show only a possibility of irreparable harm. Where, on the other hand, a party can show only that serious questions are raised, he must show that the balance of hardships tips sharply in his favor." *Bernard v. Air Line Pilots Ass'n, International, AFL–CIO*, 873 F.2d 213 (9th Cir.1989).

In 1986 the Tribes, pursuant to their Constitution, enacted Ordinance 44D which asserts exclusive civil jurisdiction over all hunting, fishing, and trapping on the Reservation. This ordinance was subsequently approved by the Secretary of the Interior and implemented by the Tribes in 1987. Following implementation of this ordinance, the Tribes and the State entered into negotiations for the purpose of developing an agreement which would facilitate the regulation of hunting and fishing within the Reservation by non-Tribal members. During the period of negotiations the Tribes did not fully enforce 44D. The purpose of the proposed agreement was to provide for unitary management and regulation of the fishery and wildlife resources.

It did not resolve any jurisdictional issues but provided a framework for the State and the Tribes to cooperate in the management of resources.

After approximately two years of negotiations, the Tribes signed the agreement on December 13, 1988. The State concluded that enabling legislation was necessary in order to allow it to implement the agreement. The Tribes found a sponsor for the enabling legislation, and with the eventual support of the new administration for passage thereof, the bill was enacted and apparently signed into law.

The Governor, however, has not yet signed the agreement, and instead has suggested that the portion of the proposed agreement dealing with prosecution of persons for violations of the regulations be deleted and that the question of court forum and jurisdiction be decided on a case-by-case basis.

In April, 1990, the Tribes reinstated full enforcement of Ordinance 44D, and the State announced that it intends to enforce State fishing regulations against non-Tribal members on the south half of Flathead Lake and the Flathead River and on fee lands owned by the State and nonmembers which lie within the exterior boundaries of the Reservation.

The Tribes now move the court to preliminarily enjoin the State from enforcing its fishing regulations within the exterior boundaries of the Reservation. They argue that the Hellgate Treaty of 1855 expressly recognized the Tribes' exclusive right to hunt and fish within the Reservation and that this right has not been abrogated by any subsequent federal law. They also argue that implementation of state hunting and fishing regulations on the Reservation is preempted by federal law and would infringe upon the Tribes' right to self-government.

The State, on the other hand, argues that it has jurisdiction to regulate hunting and fishing against nonmembers on Reservation lands held in fee by the State or by nonmembers and also on the south half of Flathead Lake and the Flathead River.

The Hellgate Treaty guarantees the Tribes "the exclusive right of taking fish in all streams running through or bordering said reservation." Treaty of July 16, 1855, 12 Stat. 975. Hunting and fishing historically played an integral part in the lives of the tribes which, pursuant to the Hellgate Treaty, now reside on the Flathead Reservation. *See Walker* Affidavit.

The Montana Supreme Court acknowledged this exclusive right of the Tribes to hunt and fish within the exterior boundaries of the Reservation in *State v. McClure*, 127 Mont. 534, 268 P.2d 629 (1954), and the Court of Appeals for the Ninth Circuit also recognized the importance of these particular treaty rights in *Bd. of Control of Flathead, et al. Irrigation Districts v. United States*, 832 F.2d 1127 (9th Cir.1987), *cert. denied*, 486 U.S. 1007, 108 S.Ct. 1732, 100 L.Ed.2d 196 (1988), and in *Confederated Salish & Kootenai Tribes v. Namen*, 665 F.2d 951 (9th Cir.1982) *cert. denied*, 459 U.S. 977, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982).

The question of whether the Tribes have authority to regulate fishing and hunting against members on the Reservation is not at issue in this case. The question of whether the Tribes have authority to enforce fishing regulations against nonmembers within the Reservation was raised by the State at the time of the hearing on the motion for preliminary injunction. However, the issue directly before the court at this time is whether the State has concurrent jurisdiction to enforce its fishing regulations against nonmembers within the Reservation.

The Tribes claim that the attempt of the State to regulate hunting within the exterior boundaries of the Reservation is preempted by federal law. In *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983), the State of New Mexico was attempting to apply its own laws to hunting and fishing by nonmembers on the reservation. In that case the tribe, in conjunction with the federal government, conducted a comprehensive fish and game development and management program and adopted ordi-

nances to regulate hunting and fishing on the reservation. New Mexico contended that it had concurrent jurisdiction over non-members, and that its hunting and fishing regulations should apply to nonmembers hunting or fishing on the Reservation. The United States Supreme Court held that the exercise of concurrent jurisdiction by New Mexico

> would effectively nullify the Tribe's unquestioned authority to regulate the use of its resources by members and non-members, interfere with the comprehensive tribal regulatory scheme, and threaten Congress' firm commitment to the encouragement of tribal self-sufficiency and economic development. Given the strong interests favoring exclusive tribal jurisdiction and the absence of state interests which justify the assertion of concurrent authority, we conclude that the application of the State's hunting and fishing laws to the reservation is preempted.

*Id.* at 344, 103 S.Ct. at 2391–92. *See also, Segundo v. City of Rancho Mirage,* 813 F.2d 1387 (9th Cir.1987).

However, in other cases involving the ability of the state to regulate hunting and fishing within reservations, courts have reached a different conclusion. The Supreme Court in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), found that although the Crow Tribe could regulate hunting and fishing by nonmembers on land belonging to the Tribe or held by the United States in trust for the Tribe, it had no power to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe. In *Montana* the Court found that the ability of the Tribe to regulate nonmembers was not necessary to protect the self-government of the Tribe or to protect the internal relations of the Tribe. The Court, in *Montana,* did recognize, however, that a tribe may retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when the conduct in question threatens or has some direct effect on the political integrity, the economic security, or the health or

welfare of the tribe. *Montana v. United States,* 450 U.S. at 566, 101 S.Ct. at 1258.

Courts have held that there are other situations in which the tribes have the authority to regulate non-Indians within a Reservation. In *Confederated Salish & Kootenai Tribes v. Namen,* 665 F.2d 951, the Ninth Circuit Court recognized the right of the Tribes to enforce regulations concerning the riparian rights of non-Indians owning land within the Reservation.

The court discussed the two rules which have developed through case law for determination of whether a tribe has been divested of any particular authority over non-Indians within the reservation. The *Colville* rule would find divestiture of only those powers inconsistent with overriding federal interests. *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 153, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980). The more restrictive *Montana* rule finds divestiture of all powers not necessary to protect tribal self-government or to control internal relations. *Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 1257, 67 L.Ed.2d 493 (1981).

The court in *Namen* found that no significant federal interests would be impaired by tribal regulation of the riparian rights of non-Indian landowners and also went on to find that the use of the bed and banks of the south half of Flathead Lake if unregulated would threaten or have a direct effect on the political integrity, the economic security, and the health or welfare of the tribe because there was danger of harm to one of the Tribes' most important resources, Flathead Lake. *Namen,* 665 F.2d at 964–65.

The Tribes in the instant case claim that they have the exclusive authority to enforce their fishing regulations against non-Indians on all lands within the Reservation. The Tribes, in conjunction with the federal government, have been very active in the development and management of the fishery resources within the reservation and have promulgated regulations which are specific to their particular needs. The Tribes' exclusive regulation of fishing with-

in the Reservation would not be inconsistent with federal interests.

Through testimony presented at the hearing and documents submitted by the parties, it is clear that the Tribes' fishing regulations are generally more restrictive than the State's regulations. The Tribes claim that to have the State enforcing its fishing regulations concurrently with the Tribes' enforcement of their own regulations would have a direct effect on the political, cultural and economic integrity of the Tribes and would cause irreparable injury to the Reservation fishery.

Two entirely different situations are presented to the court by this motion. The first of these relates to the respective authority of the parties as to the south half of Flathead Lake, and second to their respective rights to regulate on the remainder of the Reservation.

### 1. *The South Half of Flathead Lake*

The State apparently contends that somehow the same authority which allows the State to regulate fishing on the Big Horn River should allow it jurisdiction here. Implicit in that argument would be the contention that the law changed after *Namen* and that if *Namen* were decided today, a different result might follow under the holdings of *Montana*[1] and *Brendale v. Confederated Tribes and Bands of Yakima Indian Nation,* 492 U.S. ——, 110 S.Ct. 227, 107 L.Ed.2d 180 (1989). It is understandable, because of the importance of the issue to those nonmembers residing on the Reservation, that the State would look for a way to bring its case within the *Montana* and *Brendale* decisions.

However, the State and its political subdivision, Polson, were parties to *Namen. Rochester*[2] is *stare decisis,* and *Namen* is *res adjudicata* as to ownership of the lakebed.

The court, therefore, holds that the Tribes are the beneficial owners of the

south half of Flathead Lake. Tribal ownership encompasses the lake-bed to the high watermark. This being Indian Country, treaty rights and controlling law[3] vest exclusive control of fishing in the Tribes. The State has no right or power to assert its fishing regulations here even as against nonmembers.

### 2. *Other Streams within the Reservation*

The considerations are vastly different as to this fishery. The respective rights of the parties have not been largely adjudicated as in the case of the south half of Flathead Lake. Many other considerations arise. Navigability of the streams may be an issue. The population configuration must be carefully examined. The State contends that 85 per cent of the Reservation population is made up of nonmembers and that it is unreasonable for the Tribes to expect to assert exclusive jurisdiction over these nonmembers. The position of the State here is much more reasonable than that which it asserted as to Flathead Lake. It is at least possible that the cases relied upon by the State, i.e., *Montana* and *Brendale,* may be applicable here to some now unknown extent when the facts have been fully developed. The effect of State fishing regulation as to the Tribes must be studied, .and the question of pre-emption explored.

But these issues cannot be reached or decided until they have been developed through discovery or otherwise and then tried.

In the interim the court intends to maintain the status quo insofar as it is possible to do so. I am reluctant to enjoin the state from enforcing its regulations within this area of the Reservation since trial of the issues could conceivably result in certain findings of jurisdiction in the State. On the other hand, the sportfishing public is caught up in a terrible cloud of uncertainty

---

**1.** In fact, *Namen* discussed *Montana* and distinguished that decision.

**2.** *Montana Power Co. v. Rochester,* 127 F.2d 189 (9th Cir.1942).

**3.** *See Montana, supra.*

by virtue of the conflict between the fishing regulations of the State and Tribes. For the most part, the tribal regulations are more restrictive than those of the State. The State rules are merely general regulations and do not result from biological studies, as do the tribal regulations. This conflict affects not only the sportfishing public but also has the potential of substantially harming the fishery. The conflict then, must be eliminated during the pendency of this case.

It is really not necessary to enjoin enforcement of the State regulations to protect the fishery. Bringing those less restrictive rules into agreement with the more restrictive tribal regulations will fully protect the fishery while the parties develop their cases and prepare for trial. The court, therefore, strongly suggests to the State that it forthwith adopt emergency regulations making its rules no less restrictive than those of the Tribes. The court then expects the parties to maintain these regulations and their enforcement in a reasonable fashion during the remainder of the pendency of this action. The court also urges the parties to continue to negotiate and to attempt to reach agreement on the important issues presented here, in order to lessen the impact on the sportfishing public, protect the fishery, and promote amicable relations between members and nonmembers, and their respective governments.

If the State notifies the court of its agreement to adopt emergency regulations as suggested above, the court's preliminary injunction will remain limited to the south half of Flathead Lake. Otherwise, lacking this agreement by the State, communicated to the court by May 15, 1990, the court will reconsider its ruling. Accordingly,

IT IS ORDERED that the State of Montana, its agents and employees be and are hereby enjoined from enforcing its fishing regulations on the south half of Flathead Lake within the limits of the high water mark of said lake which lie within the exterior boundaries of the Flathead Indian Reservation during the pendency of this action and until the further order of the court.

IT IS FURTHER ORDERED that the motion for preliminary injunction is DENIED as to those waters within the exterior boundaries of the Reservation other than Flathead Lake but this order will be reconsidered unless the State has by May 15, 1990, communicated its agreement to revise its regulations as suggested by the court.

IT IS FURTHER ORDERED that the parties confer and within five days propose to the court a written schedule or schedules for discovery and other deadlines so that the case may proceed.

The clerk is directed forthwith to notify counsel of entry of this order.