716 F.2d 1298
 The UTE INDIAN TRIBE, Plaintiff/Appellant/Cross-Appellee,
v.
STATE OF UTAH, Defendant-Appellee,
Duchesne County, a political subdivision of the State of
Utah, Uintah County, a political subdivision of the State of
Utah, Roosevelt City, a municipal corporation, and Duchesne
City, a municipal corporation, Defendants/Appellees/Cross-Appellants,
United States of America, Amicus Curiae,
Paradox Production Corporation, a Utah corporation, Amicus Curiae.
 Nos. 81-1827, 81-1901.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 29, 1983.
 
 Daniel H. Israel of Dechert, Price & Rhoads, Denver, Colo. (Martin Seneca, Washington, D.C., with him on the brief), for plaintiff/appellant/cross-appellee The Ute Indian Tribe.
 Richard L. Dewsnup, Asst. Atty. Gen., State of Utah, Salt Lake City, Utah (David L. Wilkinson, Utah Atty. Gen., Dallin W. Jensen and Michael M. Quealy, Asst. Attys. Gen., with him on the brief), Salt Lake City, Utah, for defendant-appellee State of Utah.
 Tom D. Tobin of Tobin Law Offices, P.C., Winner, S.D. (David Albert Mustone of Tobin Law Offices, P.C., Washington, D.C., Dennis L. Draney, Roosevelt City Atty., Roosevelt, Utah, Roland Uresk, Duchesne City Atty., Roosevelt, Utah, with him on the brief), for defendants/appellees/cross-appellants Counties and Cities.
 Carol E. Dinkins, Asst. Atty. Gen., Robert L. Klarquist and Martin Green, Attys., Dept. of Justice, Washington, D.C., on the brief for amicus curiae United States of America.
 Stewart M. Hanson, Jr. and Lucy J. Skiffington of Suitter, Axland & Armstrong, Salt Lake City, Utah, on the brief for amicus curiae Paradox Production Corp.
 Before SETH, Chief Judge, DOYLE, Circuit Judge, and TEMPLAR, District Judge*.
 SETH, Chief Judge.
 
 
 1
 These appeals concern the continued existence of the Uncompahgre and Uintah Indian reservations. The Ute Tribe in Utah fashioned a Law and Order Code which purported to exercise jurisdiction over all the lands within the original Uintah reservation created by executive order in 1861 as well as the Uncompahgre Indian reservation created in 1882, both in Utah. The State of Utah and several Utah counties and cities questioned tribal jurisdiction over much of this land arguing that a great deal of the Uintah reservation and the whole of the Uncompahgre reservation had been disestablished and was no longer "Indian Country." (18 U.S.C. Sec. 1151.)
 
 
 2
 This Ute Tribe (the Uintah, White River and Uncompahgre bands) brought suit for declaratory judgment and injunctive relief, requesting that the present extent of the reservations and of tribal jurisdiction be determined. The trial court heard extensive testimony and performed an exhaustive study of legislative and administrative materials relating to the history of both the Uintah and Uncompahgre reservations. The transcript and the record comprise several thousand pages.
 
 
 3
 As to the Uintah reservation the trial court decided that the original reservation had been changed by several Acts of Congress directed to particular tracts. Thus Congress had removed a 7,040-acre tract known as the Gilsonite Strip in 1888, had removed 1,010,000 acres of land for National Forest purposes in 1905, and had also withdrawn 56,000 acres of land for a reclamation project in 1910. In 1948 the Uintah reservation was increased by 510,000 acres by the addition of the Hill Creek Extension. Except for these specific Acts of Congress, the trial court held that all lands within the original boundaries of the Uintah reservation remained "Indian Country." The individual allotments to Indians, the public law entries by others and some mineral locations were recognized. These were, however, within the exterior boundaries of the reservation.
 
 
 4
 The trial court concluded that the Uncompahgre reservation had been disestablished, 521 F.Supp. 1072.
 
 
 5
 The resolution of a dispute such as this involving Indian reservations turns on what Congress intended to accomplish at the time as a legal matter. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660; see Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92. The conclusions of the trial court on this point are persuasive, but are not considered to be findings of fact.
 
 
 6
 The method of examining legislative history and determining legislative intent in cases concerning Indian reservations has been addressed by the United States Supreme Court in recent times. Four such cases are especially significant to our problem. Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, was decided in 1962 and concerned the Colville Indian reservation. The Court held that the North half of the reservation had been disestablished, but the South half remained in reservation status. The Act of Congress said to have disestablished the North half declared that it should be "vacated and restored to the public domain." 27 Stat. 62, 63. The relevant acts with regard to the South half of the reservation allotted the land pursuant to the Congressional policy expressed in the General Allotment Act of 1887, 24 Stat. 390, but did not contain language of vacation and restoration or the term "public domain." Seymour, at 355, 82 S.Ct. at 427. The Court also mentioned subsequent legislative and administrative history of the South half of the reservation to support its conclusion that it was still a reservation. On these grounds the Court held that the South half of the reservation retained its status as Indian Country.
 
 
 7
 In Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92, decided in 1973, the Court held that the Klamath River reservation had not been disestablished. The Court made it clear that the allotment of lands within the reservation to resident Indians was consistent with reservation status and an opening for settlement in addition did not disestablish. Thus a more explicit indication of Congressional intent was necessary to disestablish. However, the Court did not rest its decision on the fact that the unequivocal language of vacation and restoration to the public domain that had been present in Seymour was absent in Mattz. Clearly the Court was unwilling to suggest that there were any special recitations the absence of which would mean that a reservation continued. In addition to considering the historical background of the reservation and the legislative history, the Court observed that several bills which contained clear language of disestablishment passed the House of Representatives but did not pass in the Senate. The Court interpreted the repeated failure of those bills as a sign of Congressional intent that the reservation continue. Thus the crucial point was not simply that the final Allotment Act for the Klamath River reservation lacked language of disestablishment, but that Congress had never at any stage permitted such language to be passed into law. It is important that in Mattz the Court stated that an opening of a reservation for settlement did not necessarily disestablish the reservation. This was referred to in the Rosebud opinion hereinafter considered. The settlement by Indians and non-Indians was considered to be of benefit to the Indians.
 
 
 8
 The Court in Mattz discussed the subsequent jurisdictional history of the reservation as an illustration for its holding of continued reservation status rather than as a foundation for that holding. No detailed analysis of legislative intent was undertaken at the time of the Acts said to constitute disestablishment for any of these cases.
 
 
 9
 DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300, raised the question of whether the Lake Traverse Indian reservation survived a restoration to the public domain. The Court held that it did not, based also on the express Indian cession of the land. This feature of the DeCoteau case has no application to the case at bar but DeCoteau is important as to the significance of the phrase "public domain." The Court, in comparing the legislation there in question to other Indian agreements, stated, at 446, 95 S.Ct. at 1094:
 
 
 10
 "That the lands ceded in the other agreements were returned to the public domain, stripped of reservation status, can hardly be questioned, and every party here acknowledges as much. The sponsors of the legislation stated repeatedly that the ratified agreements would return the ceded lands to the 'public domain.' "
 
 
 11
 The Court speaks as if a restoration to the public domain settled the matter of disestablishment. The position of the two phrases suggests that "returned to the public domain" is synonymous with "stripped of reservation status." With regard to the question of jurisdictional history, the fact that the State of South Dakota had exercised virtually undisputed jurisdiction over the land was important to the Court's decision.
 
 
 12
 Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660, is of overriding importance to the determination of the case before us because it is the most recent Supreme Court case on the subject and because it provides a detailed analysis. The facts of Rosebud are similar to those of other disestablishment cases. The language on which the Court relies in finding disestablishment of the reservation in Rosebud does not contain a phrase analogous or similar to "vacated and restored to the public domain" of Seymour. Rosebud involved unilateral action by Congress rather than cession by the Indians. Rosebud lays out what the Court terms some "well-established legal principles." One of these is the general rule that doubtful expressions are to be resolved in favor of the Indians. The Court cautions that the resolution of doubt in favor of the Indians is not to be done by ignoring clear indications of Congressional intent, nor does this method of resolving doubt intrude on the Court's holding in Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299.
 
 
 13
 In Lone Wolf the Court held that Congress possessed the authority to abrogate unilaterally the provisions of an Indian treaty. This eliminated the notion that Congressional action with regard to an Indian reservation involved some sort of implied contract. After Lone Wolf in 1903 established that Congress could act unilaterally toward Indian lands and reservations, the only relevant inquiry became Congressional intent. This prevailed in Rosebud where the Congressional action under discussion was the ratification of an agreement with the Indians. It is significant to our problem that the Court in Rosebud held that a beneficial interest retained in the lands opened does not preserve to the reservation its original size and shape.
 
 
 14
 The guiding consideration in Rosebud is, of course, the determination of Congressional intent. The Court said of this in Rosebud:
 
 
 15
 "In all cases, 'the face of the Act,' the 'surrounding circumstances,' and the 'legislative history,' are to be examined with an eye toward determining what congressional intent was."
 
 
 16
 Before turning to the application of these considerations, it is important to note one feature of the Rosebud analysis. In Mattz v. Arnett, as discussed above, the Court rejected the contention that bills passed in one House of Congress but not the other, could be an indicator of Congressional intent. Rosebud gives a contrary signal as Congress had failed to ratify a 1901 agreement which would have disestablished the reservation but ratified a similar agreement in 1904. The Court observed that the 1901 agreement would unquestionably have changed the reservation boundaries had it been ratified. The 1904 ratification the Court stated evinced a continuity of purpose and language with the 1901 attempt. Therefore, the 1901 agreement even though not ratified demonstrated "an unmistakable baseline purpose of disestablishment." Rosebud, 430 U.S. at 592, 97 S.Ct. at 1366. This line of reasoning modifies Mattz in explaining techniques of determining Congressional intent. Under Rosebud, if the language of an earlier bill is sufficiently unequivocal, and a later Act can be shown to have accomplished the intended purpose of the first, then the first gains validity as an indicator of Congressional intent even though it did not pass both Houses. This analysis has important application in the case at bar.
 
 
 17
 In Rosebud, as in DeCoteau, the assumption of state jurisdiction for many years before the suit arose was fairly clear. All the same, the Court does not rely heavily on that history, but mentions it only after having arrived at a conclusion of disestablishment on the basis of legislative history and statutory construction.
 
 
 18
 It is clear from the above cases that the controlling factors are, of course, terms of the Act with legislative intent, but we are cautioned against relying on particular statutory language. However, a phrase such as "vacated and restored to the public domain" seems to be a sufficient though not a necessary factor in disestablishment. Compare DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300, with Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660. DeCoteau implies that language restoring the reservation to the "public domain" may be enough to constitute disestablishment. The subsequent legislative and administrative history is sometimes used to support an interpretation of an Act. Finally, considerations of jurisdictional history and contemporary opinion on reservation status seem to be relied upon only where they are unequivocal. More often, they are discussed to demonstrate that they are not necessarily contrary to the conclusion already reached on the basis of statutory language and history.
 
 
 19
 In determining legislative intent it is necessary to consider the legislation in its historical context and not as if it was passed today. Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209. Mattz refers to the "surrounding circumstances." Thus a study of the purpose of any legislation involving the Indians would be incomplete and inaccurate without a consideration of the then prevailing policy on the subject. It is apparent that such policy does not follow an unwavering line, and may not appear in a very obvious way. However, in the case before us there was a very clear and drastic policy change which was put into operation throughout the West in all the larger Indian reservations. This was the General Allotment Act of 1887, 24 Stat. 390. This expressed the policy of replacing the reservations with allotments of a tract of land to each Indian to be owned individually. This was known as the Dawes Act and was introduced by Senator Dawes of Massachusetts. He had been active in groups seeking to improve the life of the Indians.
 
 
 20
 The Secretary of Interior commented when it was pending as a bill and said in part that it would:
 
 
 21
 "inspire the Indians with a feeling of assurance as to the permanency of their ownership of the lands they occupy and cultivate; it will give them a clear and legal standing as landed proprietors in the courts of law; it will secure to them for the first time fixed homes under the protection of the same law under which white men hold theirs; it will eventually open to settlement by white men the large tracts of land now belonging to the reservations but not used by the Indians. It will thus put the relations between the Indians and their white neighbors in the Western country upon a new basis, by gradually doing away with the system of large reservations, which has so frequently provoked those encroachments which in the past have led to so much cruel injustice and so many disastrous collisions."
 
 
 22
 Report of the Secretary of the Interior, 1880, in serial 1959, pp. 5-6, 12.
 
 
 23
 Senator Dawes understood the Act to have as its goal the abolition of the reservation system. In addressing the Fifth Annual Meeting of the Lake Mohawk Conference of the Friends of the Indian, Senator Dawes stated:
 
 
 24
 "Suppose these Indians become citizens of the United States with this 160 acres of land to their sole use, what becomes of the Indian Reservations, what becomes of the Indian Bureau, what becomes of all this machinery, what becomes of the six commissioners appointed for life? Their occupation is gone; they have all vanished, the work for which they have been created ... is all gone .... You are not mending this fabric; you are taking it down stone by stone ...."
 
 
 25
 Minutes of the Lake Mohawk Conference, 1887, pp. 12-13.
 
 
 26
 Thus in the period between 1897 and 1905 when legislation opening the Uncompahgre and Uintah reservations was passed, the policy embodied by the Dawes Act was in full force and being implemented. "Friends of the Indians" wished to abolish the reservations out of a genuine conviction that such an abolition would contribute to the Indians' welfare. Concurrently with Senator Dawes but separately there were present in a myriad of forms the forces of expansion always seeking the development of the West and especially seeking more land in the West. These forces were likewise effective in Congress at the time here concerned.
 
 
 27
 We cannot be here influenced by what Congress might have done. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660. We must instead decide what Congress in fact did. "[O]ur task here is a narrow one .... [W]e cannot remake history." DeCoteau v. District County Court, 420 U.S. 425, at 449, 95 S.Ct. 1082, at 1095, 43 L.Ed.2d 300.
 
 
 28
 The Utes argue that the original Uintah and Uncompahgre reservations exist to their original extent except as to a few relatively small tracts. The two reservations when created contained some 4,000,000 acres. In 1905, when Congress was considering legislation concerning the reservations, there were about 1,440 Utes in the three bands. There are now about 1,500 enrolled members of the tribe. Nearly all of these live on the trust lands (that is on allotments and tracts reserved for tribal use). Federal programs and services appear to be available to all regardless of the outcome of this case.
 
 
 29
 Under the decision of the trial court the non-Indian towns of Duchesne and Roosevelt are within what were considered to be the reservation boundaries. About 90 percent of the population of a reservation so constituted would live in these towns. Most of the lands opened for settlement are in Duchesne County. About 300 Indians live there, but all are not members of the tribe. No one challenges the Indians' claim to the tracts for grazing set apart for the Indians and, of course, to the allotments made to individual Indians (about 360,000 acres) nor to the lands restored in the 1940's to the Indians (some 217,000 acres) nor to the Hill Creek Extension of about 500,000 acres. The basic dispute is to the non-Indian owned portions of the original reservations, and the National Forest portion.
 
 
 30
 Before the present dispute the trust land, the reserves and the allotments were referred to as the "Ute reservation" or the "Uintah reservation," and this explains the occasional use of the terms when additions were made extending the reservation or extending the reservation boundaries.
 
 I. THE UNCOMPAHGRE RESERVATION
 
 31
 The Uncompahgre reservation when established contained about 3,000 square miles and was apparently never occupied by more than several hundred Utes at any time. Most of them by 1905 had moved to the Uintah reservation, and they had taken allotments on that reservation rather than on the Uncompahgre.
 
 
 32
 In determining the status of the Uncompahgre reservation we are chiefly concerned with two pieces of legislation. The first is part of the Indian Appropriations Act of 1894, which contains this language:
 
 
 33
 "Sec. 20. That the President of the United States is hereby authorized and directed to appoint a commission of three persons to allot in severalty to the Uncompahgre Indians within their reservation, in the territory of Utah, agricultural and grazing lands .... Said commissioners shall ... report to the Secretary of the Interior what portions of said reservation are unsuited or will not be required for allotments, and thereupon such portions so reported shall, by proclamation, be restored to the public domain and made subject to entry as hereinafter provided.
 
 
 34
 ....
 
 
 35
 "Sec. 22. That said commission shall also negotiate and treat with the Indians properly residing upon the Uintah Indian Reservation, in the territory of Utah, for the relinquishment to the United States of the interest of said Indians in all lands within said reservation not needed for allotment in severalty to said Indians, and if possible, procure the consent of such Indians to such relinquishment, and for the acceptance by said Indians of allotments in severalty of lands within said reservation, and said commissioners shall report any agreement made by them with said Indians, which agreement shall become operative only when ratified by Act of Congress."
 
 
 36
 Act of August 15, 1894, ch. 20, 28 Stat. 286, 337-338.
 
 
 37
 This Act directs the Secretary to immediately open the unallotted lands, after approval of the allotments to entry. The land reported as unsuitable shall "thereupon" be restored to public domain by proclamation. The use of the then universally recognized term "public domain" in designating the eventual status of the land is of critical importance. The status of "public domain" there demonstrates an intent to disestablish. See DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300; Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346. Land to be in the "public domain" is inconsistent with reservation status or any particular use status. When public land is designated to be used for a particular purpose the land no longer remains in the "public domain." Scott v. Carew, 196 U.S. 100, 25 S.Ct. 193, 49 L.Ed. 403; Wilcox v. Jackson, 13 Pet. 498, 10 L.Ed. 264. Thus the creation of an Indian reservation or a forest or other particular use from public land removes it from the public domain. Missouri, Kansas and Texas Ry. Co. v. Roberts, 152 U.S. 114, 14 S.Ct. 496, 38 L.Ed. 377; Leavenworth, Lawrence and Galveston Railroad Co. v. United States, 92 U.S. 733, 23 L.Ed. 634. The "public domain" is a well-recognized description of the status of the land. It was probably more generally recognized at the time the acts in issue were passed than it is now. It is clear that the creation of an Indian reservation from "public lands" removes the subject lands from the public domain. The return of particular use lands to the public domain involves similar land status concepts, and "public domain" then must have the same meaning as it did before. In DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300, the Court held that public domain status and reservation status are mutually exclusive.
 
 
 38
 Another feature of the 1894 Act is the presence of limitations on "entry" when the land is opened. The tribe argues with respect to the Uintah reservation that limitations on entry demonstrate that Congress did not intend full public domain status for the land. The opening of the Uncompahgre reservation disproves this theory both in the 1894 Act and in the legislative history of that Act. On the face of the 1894 Act the term "public domain" appears simultaneously with provisions limiting entry. Clearly, Congress did not consider these two things to be inconsistent. The legislative history shows that the purpose of the limitation to homestead and townsite entry was not to permit the Indians to retain control of the land, but was to prevent land speculation. Congress gave a great deal of time and care to trying to prevent the land from being snapped up by speculators. 53 Cong.Rec. 7684 (1894); 53 Cong.Rec. 7258-59 (1894). At no time during these debates was there any discussion to suggest a continuing claim by the Indians. Rather the House debated whether the Indians would be required to pay for their allotted lands, implying that Indian title to the reservation was not secure even in 1894 without some payment. 53 Cong.Rec. 7258 (1894). The proper analysis is that once land has been again placed in the public domain it is open and free to the application of the public land laws. Congress may then make limitations on entry and location, but these do not change the status of the land.
 
 
 39
 A final note about the 1894 Act is that it provides that the commission appointed to allot to the Uncompahgres should also attempt to procure the agreement of the Uintah Indians to the relinquishment of their land. Thus as early as 1894, Congress contemplated the allotment and opening of the Uintah reservation. It is difficult to escape the impression that Congress hoped and sought to have allotments made to all the Indians as individuals, and to open the land in the reservations not so allotted under the public land laws.
 
 
 40
 Thus the 1894 Act, although it did not accomplish the opening of the reservation, persuasively indicates by the use of the term "public domain" that it was Congress' intent to remove this land from the Indian reservation. The power of this phrase is not weakened by any limitations on methods of entry to the land. We therefore conclude that this piece of legislation may be sufficient to demonstrate a "baseline" purpose to disestablish that later legislation carried through. The commission appointed by the 1894 Act failed in its efforts to make allotments to the Uncompahgres and was disbanded in 1896.
 
 
 41
 In 1897, Congress enacted a provision which made the allotment and opening of the Uncompahgre reservation mandatory. Thus:
 
 
 42
 "The Secretary of the Interior is hereby directed to allot agricultural lands in severalty to the Uncompahgre Ute Indians now located upon or belonging to the Uncompahgre Ute Indian Reservation in the State of Utah, said allotments to be upon the Uncompahgre and Uintah Reservation or elsewhere in said State. And all the lands of said Uncompahgre Reservation not theretofore allotted in severalty to said Uncompahgre Utes shall, on or after the first day of April, eighteen hundred and ninety-eight, be open for location and entry under all the land laws of the United States, excepting, however, therefrom all lands containing gilsonite, asphalt, elaterite, or other like substances."
 
 
 43
 Act of June 7, 1897, ch. 3, 30 Stat. 62, 87.
 
 
 44
 The analogy to Rosebud which we have pursued here is not exact. The 1894 Act was in fact passed by both Houses of Congress, but its execution was not accomplished as we have seen. As an instrument of disestablishment it did not itself mandate the actual opening of the reservation, but the lands were to be restored to the public domain. When the lands became public domain they thereby were available under the public land laws to entry and location in the usual manner for all public lands. The "opening" and details for making entries were included in other acts to provide some organization to the expected rush to make entries. Thus the drawings here and at Rosebud were provided much like the simultaneous filings of today. Several hundred thousand people appeared for the Sioux drawings.
 
 
 45
 As the trial court observed, legislative and administrative history supports the conclusion that the Uncompahgre reservation was disestablished. The commission attempted to make allotments after the opening date of the 1897 Act as if the land was on a reservation. The Commissioner of Indian Affairs was unsure of the legality of this, as the lands were now in the "public domain." Rept. of the Comm. of Ind.Aff., 1898, JX 108, in H.Doc. No. 5, 55th Cong. 3d Sess. In the next few years, there were concerns that even these allotments might fail, and the Indian agent suggested that these Indians abandoned the lands for lands on the Uintah reservation. See Letter from Acting Agent Mercer to Comm. of Ind.Aff. of Sept. 9, 1903, JX 174; Letter from Agency Clerk to the Agent of Aug. 31, 1903, JX 173; Letter from the Comm. of Ind.Aff. to Acting Agent Mercer of July 28, 1903, JX 170. Finally, by 1929, the Bureau of Indian Affairs seems clearly to have taken the position that the Uncompahgre reservation no longer existed. See Statement Concerning the Uncompahgre Grazing Reserve, Feb. 6, 1943, JX 451; Memorandum Relating to the Proposed Withdrawal of Certain Lands for Uncompahgre Ute Indians, Office of Indian Affairs, 1931, JX 426.
 
 
 46
 A final point illustrates both that "public domain" language was intended to apply through the 1897 Act to the Uncompahgres and that Congress, at least to some extent, considered the Uncompahgres and the Uintahs together when making law concerning the Indian reservation in Southern Utah. In the 1897 Act, it is expressly provided that the Uncompahgres may be given allotments on Uintah land. In 1902, in dealing with the Uintah reservation Congress again explicitly provided that the Uncompahgres be given allotments on Uintah land. 32 Stat. 245. This 1902 Uintah Act also contained "public domain" language. We do not rely on these connections, but they do provide some indicators of Congressional actions and intentions with regard to the Ute Tribe.
 
 
 47
 We understand Congress to have intended, and did disestablish the Uncompahgre reservation as concluded by the trial court.
 
 II. THE UINTAH RESERVATION
 
 48
 An Indian reservation was established by President Lincoln in 1861 to encompass the entire valley of the Uintah River within the Utah Territory. This was at the time the Government was attempting to have the Utes of Colorado and New Mexico and others settle in designated areas. The reservation was thus for any Indian. Congress confirmed the reservation in 1864 (13 Stat. 63). This in part said:
 
 
 49
 "Sec. 2. And be it further enacted, That the superintendent of Indian affairs for the territory of Utah be, and he is hereby, authorized and required to collect and settle all or so many of the Indians of said territory as may be found practicable in the Uinta valley, in said territory, which is hereby set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same." (Emphasis in original.)
 
 
 50
 The reservation contained about 3,186 square miles or 2,039,040 acres, and may have been established for many more Indians than those who "were induced to inhabit the same."
 
 
 51
 In the half century following the establishment of the reservation Congress enacted several laws which the counties and cities claim altered substantially the status of the lands initially encompassed within it. The Utes claim the entire reservation as initially created save for two small diminishments, and claim that the legislation did not affect their rights. The counties and cities claim that the legislation enacted between 1888 and 1905 diminished the original reservation by withdrawing acreage on several occasions: to enable mining in the area known as the Gilsonite Strip; to enlarge the Uintah National Forest; and to create an irrigation project along the Strawberry River. The counties and cities also claim that the Acts of Congress in 1902 and in 1905 directed that allotments of lands in the reservation be made to individual Indians and provided that all lands not allotted were restored to the public domain, and thereby were no longer a part of the reservation.The Gilsonite Strip Withdrawal
 
 
 52
 The first of the Acts of Congress was directed to a 7,000-acre tract in the reservation. In 1886 a prospector had located mining claims on the Uintah reservation for the mineral gilsonite. The land in question was not then being used by the Indians for agricultural or grazing purposes. Congress in 1888 passed an Act which mandated that the 7,040-acre "Gilsonite Strip" be "declared to be public lands of the United States and restored to the public domain." Act of May 24, 1888, ch. 310, 25 Stat. 157. The Act directed the Secretary of the Interior to procure the approval of a three-fourths majority of the adult male Indians, and to sell the land. Approval was secured and some sales made. The proceeds were credited to the Utes. The trial court found, and the parties do not dispute on appeal, that the Gilsonite Strip was removed from the reservation. We agree with this conclusion. The 1888 Act contained a significant restriction on the manner of entry after the lands were restored to the public domain. Thus the lands were to be sold in lots not exceeding one-quarter section in size. The parties do not dispute that this limitation on the manner of the disposition did not affect its removal from the reservation and restored it to the "'public domain."
 
 Unallotted Lands
 
 53
 During the 1890's and thereafter there was increasing pressure on Congress and the President to open parts of most of the large Indian reservations in the West to settlement by non-Indians, and also to have the Indians own individually tracts of land for their own betterment. We have mentioned these two movements in this opinion. The literature of the time and the court opinions refer to these as the "familiar forces."
 
 
 54
 The familiar forces thus sought to remove parts of the Uintah Valley reservation from reservation status and so to permit individual ownership by the Indians and to open it for settlement and mining. Thus in this context, with the recognized policy evidenced by the General Allotment Act, and the opening of other reservations, the Uintah Valley reservation was not an isolated instance where the "familiar forces" brought about changes. The people seeking the changes as a betterment for the Indians were sincere in their views. Many public figures advocated individual ownership by Indians, as indeed did a majority in the Congress and the President. The General Allotment Act must be taken as one example and is a clear and definite expression of the policy. Directions to carry it out were included in many pieces of legislation. This was the dominant feeling and policy of the time, the time when the legislation herein considered was passed. Its intent and purpose must be determined in that context, and not as the policies may now exist. Thus Congress in 1888 (25 Stat. 157) declared that a described portion of the Uintah Valley reservation "is hereby declared to be public lands of the United States and restored to the public domain." The Act provided that the restoration be effective upon ratification by three-fourths of the Indians on the reservation. This ratification was not obtained.
 
 
 55
 Congress also had commissions appointed to negotiate allotments and cessions of the Uncompahgre and Uintah reservation in 1894, 1897 and 1898.
 
 
 56
 Then on May 27, 1902 Congress included as part of the Indian appropriations bill a direction that allotments be made to all adult White River and Uintah Utes. This included a provision restoring any unallotted lands of the 1864 Uintah reservation to the "public domain." Act of May 27, 1902, 32 Stat. 245, 263. The provision, in pertinent part, is as follows:
 
 
 57
 "That the Secretary of the Interior, with the consent thereto of the majority of the adult male Indians of the Uintah and the White River tribes of Ute Indians, to be ascertained as soon as practicable by an inspector, shall cause to be allotted to each head of a family eighty acres of agricultural land which can be irrigated and forty acres of such land to each other member of said tribes, said allotments to be made prior to October first, nineteen hundred and three, on which date all the unallotted lands within said reservation shall be restored to the public domain."
 
 
 58
 The term "public domain" was used twice more in the later portions of the Act. This was one of several connected acts about which this dispute is centered and the references to "public domain" status for the lands not allotted to individual Indians are very significant to the arguments of the parties and to the position taken by the trial court. Congress thereafter used appropriation acts in 1903, 1904 and 1905 to extend the time for opening and to insert added provisions. This was a series of acts with no express words of amendment and with express repeal of relatively small elements in the prior acts.
 
 
 59
 The trial court reasoned that the Supreme Court's holding in Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, compelled a finding that the language of the 1902 Act providing that all of the unallotted lands "shall be restored to the public domain" would have disestablished the reservation had the unallotted lands then been opened for settlement. The trial court reasoned, however, that this 1902 Act was so changed by a 1905 enactment that such a result did not come about.
 
 
 60
 The Utes attempt to distinguish Seymour by arguing that this 1902 Act may restore the unallotted lands to the public domain, but there is also needed a provision that the lands be vacated by the tribe before the lands are restored to the public domain. They argue that the cases uniformly provide independent language to indicate that the reservation boundaries would be extinguished or adjusted at the same time that public entry was allowed is necessary to disestablish. They cite DeCoteau v. District County Court, 420 U.S. 425, 445-46, 95 S.Ct. 1082, 1093-94, 43 L.Ed.2d 300 (the express language of cession and relinquishment of reservation lands restored them to the public domain); Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (Act of March 2, 1889, Sec. 21, 25 Stat. 896, created six separate reservations from the Great Sioux reservation and "all the lands in the Great Sioux Reservation outside of the separate reservations herein described are hereby restored to the public domain," 25 Stat. at 896); Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 ("vacated and restored to the public domain"); Starr v. Long Jim, 227 U.S. 613, 33 S.Ct. 358, 57 L.Ed. 670 (Secretary of the Interior to cause the quantity of land allowed Indians remaining on the reservation to be selected in as compact a form as possible, the remainder to be restored to the public domain, Act of July 4, 1884, 23 Stat. 76); Russ v. Wilkins, 624 F.2d 914 (9th Cir.) (explicit description of new reservation boundaries, the remainder "restored to the public lands of the United States," 17 Stat. at 634). These cited cases, as indicated by the notes, are however a mixture of statutory provisions, and do not stand for a proposition that a provision vacating the reservation or describing new boundaries is required for disestablishment.
 
 
 61
 The argument that the operative language of restoration must contain independent language adjusting or extinguishing reservation boundaries is unpersuasive. The Supreme Court has never mentioned such a requirement, see, e.g., Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660; Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, and we see no reason to impose one now. The trial court was correct in determining that the 1902 Act would have accomplished the disestablishment of the reservation as to unallotted lands had the lands been then opened. An additional factor relative to the 1902 Act was an addition to it providing for a tract of grazing land to be set apart for the common use of the Indians to meet the reasonable need of the Indians. This provision was added by a joint resolution on June 19, 1902 (32 Stat. 744). It in part provided:
 
 
 62
 "In addition to the allotments in severalty to the Uintah and White River Utes of the Uintah Indian Reservation in the State of Utah, the Secretary of the Interior shall, before any of said lands are opened to disposition under any public land law, select and set apart for the use in common of the Indians of that reservation such an amount of nonirrigable grazing lands therein at one or more places as will subserve the reasonable requirements of said Indians for the grazing of live stock."
 
 
 63
 This addition is significant in evaluating the 1902 Act and further demonstrates the status of the reservation lands before the opening.
 
 After the 1902 Act
 
 64
 The Indian consent required by the 1902 Act was not forthcoming within the time limit to make the allotments, and Congress had to take further action. However, the matter was influenced in a very substantial way by the decision of the Supreme Court in Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299, decided January 5, 1903. The Court there held that Congress could unilaterally change Indian reservations; that no tribal or Indian consent was required; and that there was no contractual relationship between the Government and the tribe arising from the establishment of a reservation. As is apparent, this had significant implications on what Congress was trying to accomplish as to this reservation and as to others.
 
 
 65
 In another appropriation act Congress by the Act of March 3, 1903 (32 Stat. 982) again extended the time for opening the unallotted lands for entry as provided in the 1902 Act, and eliminated any reference to consent of the Indians.
 
 
 66
 In 1904, Congress again extended in an appropriation act the time for the opening to March 10, 1905 so that surveying could be completed and allotments made. Act of April 21, 1904, 33 Stat. 189, 207.
 
 
 67
 The trial court held, and the parties do not dispute on appeal, that the 1903 and 1904 Acts did not affect the operative terms of the 1902 Act. We agree.
 
 
 68
 The time set by the 1904 Act for allotments to be completed (March 10, 1905) was running out and Congress again used an appropriation act to extend the time. However, there were added this time some new provisions by this Act of March 3, 1905 (33 Stat. 1048). There were provided more details as to the opening of the unallotted lands for entry, and restrictions were added as well which were of significance.
 
 This 1905 Act in part provided:
 
 69
 "That the said unallotted lands, excepting such tracts as may have been set aside as national forest reserve, and such mineral lands as were disposed of by the act of Congress of May twenty-seventh, nineteen hundred and two, shall be disposed of under the general provisions of the homestead and town-site laws of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof;
 
 
 70
 "That before the opening of the Uintah Indian Reservation the President is hereby authorized to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules, and regulations governing forest reserves, and subject to the mineral rights granted by the act of Congress of May twenty-seventh, nineteen hundred and two, such portion of the lands within the Uintah Indian Reservation as he considers necessary, and he may also set apart and reserve any reservoir site or other lands necessary to conserve and protect the water supply for the Indians or for general agricultural development, and may confirm such rights to water thereon as have already accrued: Provided, That the proceeds from any timber on such addition as may with safety be sold prior to June thirtieth, nineteen hundred and twenty, shall be paid to said Indians in accordance with the provisions of the act opening the reservation." (Emphasis in original.)
 
 The Relationship of the 1902 and 1905 Acts
 
 71
 This court considered the relationship of the various enactments concerning the Uintah reservation and certain issues regarding the status of the unallotted lands in Hanson v. United States, 153 F.2d 162 (10th Cir.). We there concluded that the issue had to be decided under the 1902 Act, and that the 1905 Act merely extended the date of opening of the reservation and did not affect the operative terms of the 1902 Act.
 
 
 72
 What is advanced as "limitations" on disposition in the 1905 Act is the provision that the unallotted lands were to be disposed of under "the general provisions of the homestead and town-site laws, ... and shall be opened to settlement and entry by proclamation of the President." The 1905 Act does not specifically utilize or repeat the "public domain" language of the 1902 Act.
 
 
 73
 The provision that the lands be opened under the homestead and townsite laws does not constitute a substantial restriction which militates against the conclusion that the public domain intent in the 1902 Act was carried over into the 1905 Act. The limitation in the Rosebud opening is comparable as is Starr v. Long Jim, 227 U.S. 613, 33 S.Ct. 358, 57 L.Ed. 670. The provisions considered in Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92, and in Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, do not lead to a contrary conclusion. In the case before us the provisions in the prior acts dictated the public domain conclusion under the 1905 Act.
 
 
 74
 Nothing in the Congressional debates suggests an attempt to change the 1902 intent. See 39 Cong.Rec. 1181-85, January 21, 1905. Rather, Congress was concerned in 1905 with the possibility that land speculators would deprive actual homeseekers of the choicest land. "Indian Appropriations Bill, 1906," Hearings, Subcomm. of the Sen.Comm. of Ind.Aff., 58th Cong., 3d Sess. (1905).
 
 
 75
 The intent of the 1905 Act was thus to effect the restoration of the unallotted lands to the public domain and to allow entry under the homestead and townsite laws to prevent speculation.
 
 
 76
 Evidence of this intent can be found in the Committee Report to S. 6867 in 1905, a bill which used language virtually identical to that found in the 1905 Act. There the report included letters from the Commissioner of Indian Affairs and from the Commissioner of the General Land Office which referred to the lands as being in the public domain or as public lands. S.Rep. No. 4240, 58th Cong., 3d Sess. (1905).
 
 
 77
 It is difficult to accept the argument that limitations on the manner of entry necessarily vitiate Congressional intent to disestablish the reservation in view of the Gilsonite Strip withdrawal herein considered. There, some 7,000 acres were restored to the public domain subject to a limitation on disposition to purchase with a maximum number of acres. As we have noted, neither party disputes that the strip was removed from reservation status. Thus limitations on entry are not necessarily inconsistent with the disestablishment. As mentioned in the Rosebud opinion Congress knew what operative words were needed to accomplish the purpose.
 
 
 78
 As mentioned, the changes were accomplished by a series of provisions contained in Indian appropriation acts of 1902, 1903, 1904 and 1905. Each act built on the ones before, and especially by "extending" the time for opening from those provided before. This shows a continuous process brought about by the delays encountered on the ground. The acts also did not seek to expressly amend the prior act but, as mentioned, built on the one before. This prevails as to matters other than time "extensions." There were several express repeals, but only as to specific elements which were not of significance. Thus there were no general repeals but only additions of items here of concern. This cumulative series of enactments should be compared to the position taken by the Supreme Court in Rosebud, as we have already mentioned. There an agreement that failed to be ratified by Congress in 1901 could be considered in determining the intent of a 1904 Act. The 1904 Act or agreement indicated continuity of purpose and language with the 1901 attempt. The 1901 agreement showed "an unmistakable baseline purpose of disestablishment." Rosebud, 430 U.S. at 592, 97 S.Ct. at 1366. This same demonstration of continuity is present in the case before us and the 1902 Act does also show a "baseline purpose of disestablishment." Again, the persuasiveness is greater here because the earlier language was in acts that passed both Houses and not in bills that failed.
 
 
 79
 Even if it were not clear from the terms of the 1905 Act and its legislative history that the 1905 Act was not intended to affect the substantive terms of the 1902 Act, 39 Cong.Rec. 3868, 3919, 39 Cong.Rec. 1181-83, the contemporaneous and subsequent legislative and administrative treatment of the unallotted lands confirms that they were part of the public domain.
 
 
 80
 The most important indication of the effect of the 1905 Act is President Roosevelt's Proclamation of July 14, 1905 which stated, in relevant part:
 
 
 81
 "Whereas it was provided by the Act of Congress, approved May 27, A.D., 1902 (32 Stat., 263), among other things, that on October first, 1903, the unallotted lands in the Uintah Indian Reservation, in the State of Utah, 'shall be restored to the public domain: Provided, That persons entering any of said lands under the homestead laws shall pay therefor at the rate of one dollar and twenty-five cents per acre'.
 
 
 82
 "And, whereas, the time for the opening of said unallotted lands was extended to October 1, 1904, by the Act of Congress approved March 3, 1903 (32 Stat., 998), and was extended to March 10, 1905, by the Act of Congress approved April 21, 1904 (33 Stat., 207), and was again extended to not later than September 1, 1905, by the Act of Congress, approved March 3, 1905 (33 Stat., 1069), which last named act provided, among other things:
 
 
 83
 ....
 
 
 84
 "Now, therefore, I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by said Acts of Congress, do hereby declare and make known that all the unallotted lands in said reservation, excepting such as have at that time been reserved for military, forestry and other purposes, and such mineral lands as may have been disposed of under existing laws, will on and after the 28th day of August, 1905, in the manner hereinafter prescribed, and not otherwise, be opened to entry, settlement and disposition under the general provisions of the homestead and townsite laws of the United States ...."
 
 
 85
 Presidential Proclamation of July 14, 1905, 34 Stat., pt. 3, 3119.
 
 
 86
 The lands were to be opened by a presidential proclamation, and of great significance in any determination of the intent of Congress is the executive implementation of the legislation. The proclamation is very similar in all significant respects to the Rosebud proclamation. This proclamation, with its references and adoption of terms from the 1902 Act, in our view demonstrates the continuation of the 1902 provisions, and confirms the public domain status of the unallotted lands. The proclamation is "an unambiguous, contemporaneous, statement, by the Nation's Chief Executive, of a perceived disestablishment" of the reservation. Rosebud Sioux Tribe v. Kneip, 430 U.S. at 602-3, 97 S.Ct. at 1371.
 
 
 87
 A further indication that the unallotted lands were no longer part of the reservation after it was opened is the subsequent restoration of some of those lands to reservation status for the Utes. Much if not all of the unallotted lands on the original Uintah reservation which had not been disposed of under the public land laws were restored in 1945. The Order of Restoration recites that "pursuant to the provisions of the act of May 27, 1902 (32 Stat. 263)" the unallotted lands were made subject to disposal under the laws applying to public lands. As indicated this restoration acknowledges that the opening was under the 1902 Act. Section 3 of the Reorganization Act provides that the Secretary of the Interior is authorized "to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened." Act of June 18, 1934, 73rd Cong., 2d Sess., Sec. 3. Neither party disputes that the restorations accomplished pursuant to Sec. 463 of 25 U.S.C. made them part of the reservation. We agree. This restoration included about 217,000 acres.
 
 
 88
 Much later administrative treatment of the unallotted lands also confirms the proposition that those lands were restored to the public domain. See, e.g., Opinion of the Solicitor of the Department of the Interior, January 27, 1947, 59 I.D. 393 (unallotted lands were "restored to the public domain pursuant to the Act of May 27, 1902, as amended.... Although the lands were restored to the public domain, they were subject to disposition only under the Act of May 27, 1902, as amended." Id. at 393, 394); Letter from the Commissioner of Indian Affairs to the Secretary of the Interior, June 19, 1941.
 
 
 89
 The largest single addition occurred in 1948 when Congress added the Hill Creek Extension of some 510,000 acres of the former Uncompahgre reservation to the Uintah and Ouray reservation. Act of March 11, 1948, ch. 108, 62 Stat. 72.
 
 
 90
 We have also examined the maps introduced by the parties and the governmental statistics setting forth the acreage of the reservation and find them to support the position taken by the counties and cities. Statements made by the Utes themselves also tend to detract from their position. For example, the 1957 Ute Ten Year Development Program provides a description of the total acreage of the Uintah and Ouray reservation as currently containing 1,010,000 acres. In detail, it delineates, "The original area of the Uintah Reservation in Wasatch, Duchesne and Uintah Counties were reduced as follows...." (The document then details the Gilsonite Strip reduction, the 1905 addition to the Uintah Forest Reserve, the Strawberry River reduction, the 1902 grazing reserve and allotments to individual Indians and "[a]pproximately 798,877 acres were disposed of by the United States for cash, or otherwise set aside and taken for its own use at various times since the opening of the reservation in 1905.") The statistics of the Office of Indian Affairs show similar figures.
 
 
 91
 Both parties have introduced substantial evidence regarding administrative and legislative appellations to the "current" or "former" status of the reservation. Our review of those references evinces no discernible Congressional intent one way or the other. There is simply no consistent, clear and uniform identification of the reservation's status in the subsequent legislative record. Analysis of the newspaper accountings of the events occurring on the reservation is similarly opaque.
 
 
 92
 Thus, after closely examining the record as it relates to the unallotted lands, we must conclude that the trial court erred in holding that the unallotted lands were not returned to the public domain pursuant to the 1902 Act.
 
 
 93
 Other Issues--Pre-opening Withdrawals Forest Reserve Lands
 
 
 94
 Besides extending the time of entry under the 1902 Act and describing the entry thereunder, the 1905 Act also provided that before the opening the President was authorized to set apart and reserve lands in the reservation as an addition to the Uintah Forest Reserve. 33 Stat. 1070. Specifically, the Act states:
 
 
 95
 "That before the opening of the Uintah Indian Reservation the President is hereby authorized to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules and regulations governing forest reserves, ... such portion of the lands within the Uintah Indian Reservation as he considers necessary...."
 
 
 96
 By proclamation, President Theodore Roosevelt withdrew 1,010,000 acres from the Uintah reservation for that purpose. Proclamation of July 14, 1905, 34 Stat. pt. 3, 3116. The reserve was created pursuant to specific authority under the 1905 Act and the general authority he already had.
 
 
 97
 The trial court found that the presidential forest reserve proclamation extinguished those portions of the reservation included therein. On appeal, the Utes argue that the statutory language of the 1905 Act and the contemporaneous legislative history did not extinguish the reservation boundaries nor did Congress ever enact subsequent legislation to extinguish the Utes' title. In the proclamation creating the forest reserve out of the reservation lands it was expressly provided that the reserve be an addition to the Uintah Forest Reserve which theretofore existed. The addition was to be "subject to the laws, rules, and regulations governing forest reserves."
 
 
 98
 Our review of the 1905 Act, the presidential proclamation, the pertinent legislative history and the subsequent treatment of the subject lands convinces us that the forest reserve lands are not part of the reservation. No express language of termination of Indian jurisdiction over the Forest Service lands or an express extinguishment of the reservation boundaries was required. As we noted previously the Supreme Court has held that the "clear language of express termination" is not a required talisman for termination or disestablishment. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 588 n. 4, 97 S.Ct. 1361, 1364 n. 4, 51 L.Ed.2d 660. The authority was present and was exercised to so change the land status from reservation lands to public forest reserves. The administrative authority over the lands was transferred from the Secretary of the Interior to the Secretary of Agriculture pursuant to the Act of February 1, 1905, ch. 288, 33 Stat. 628, and subjected the Forest Service lands to an entirely different regulatory regime. By transferring of reservation status to the status of the Forest Service lands thus for public use and by shifting the administrative authority over them, Congressional intent to remove the lands from the reservation is clearly evidenced.
 
 
 99
 Our holding that Indian jurisdiction is inconsistent with the land's status as forest reserve land is consonant with recent holdings by the Court of Claims and the Ninth Circuit. Both courts held that the designation of land as a forest reserve is itself effective to extinguish Indian title. United States v. Pueblo of San Ildefonso, 513 F.2d 1383, 1386, 1391-93 (Ct.Cl.); United States v. Gemmill, 535 F.2d 1145 (9th Cir.). The Ninth Circuit went on to find that "any ambiguity about extinguishment that may have remained after the establishment of the forest reserves, has been decisively resolved by congressional payment of compensation to the ... Indians for these lands." Id. at 1149. The Utes received $1,217,000.00 in compensation. The situation before us is very similar as Congress added to a forest reserve by removing lands from an Indian reservation and later compensating the Indians for the lands. The trial court was correct in finding that the 1,010,000 acres withdrawn pursuant to the July 14, 1905 presidential proclamation were no longer part of the Uintah reservation.
 
 The Strawberry River Reclamation
 
 100
 The third major part of the 1905 Act authorized the President before the reservation was opened to "set apart and reserve any reservoir site or other lands necessary to conserve and protect the water supply for the Indians or for general agricultural development." President Roosevelt withheld from disposal 56,000 acres along the Strawberry River for reclamation purposes pursuant to that authority in August 1905. Presidential Proclamation of August 3, 1905, 34 Stat. pt. 3, 3141.
 
 
 101
 Five years later, Congress compensated the Utes for the Strawberry River lands and clearly extinguished any Indian interest in the lands by providing that "[a]ll right, title, and interest of the Indians in the said lands are hereby extinguished, and the title, management and control thereof shall pass to the owners of the lands irrigated from said project ...." Act of April 4, 1910, 36 Stat. 269, 285.
 
 
 102
 Neither side disputes the trial court's holding that the reservation was diminished to the extent of the 56,000-acre Strawberry River withdrawal.
 
 
 103
 The withdrawal of lands for the Strawberry River irrigation project does not give rise to any implication that the unallotted lands remained part of the reservation. The Strawberry River lands were set apart and reserved on August 3, 1905, over three weeks prior to the opening of the reservation on August 28, 1905. Affirmative action to remove the Strawberry River lands from the reservation was then necessary because the reservation had not yet been opened. The Strawberry River withdrawal has no bearing on the status of lands which were subsequently to be opened to the public domain.
 
 III. CONCLUSION
 We summarize our conclusions as follows:
 
 104
 1. We affirm the trial court's holding that the original Uncompahgre reservation was disestablished by Congress pursuant to the Act of June 7, 1897 and no longer exists.
 
 
 105
 2. We affirm the trial court's holding that prior to August 28, 1905, the original boundaries of the Uintah Valley Indian reservation were diminished by Congress through the withdrawal of the Gilsonite Strip in 1888, by the withdrawal of 1,010,000 acres subsequently made part of the Uintah National Forest, and by the withdrawal of approximately 56,000 acres for the Strawberry River irrigation project.
 
 
 106
 3. We affirm the trial court's finding that the 510,000-acre Hill Creek Extension was incorporated within the Uintah and Ouray Indian reservation.
 
 
 107
 4. As to the Uintah Valley reservation, we must reverse the holding of the trial court that the unallotted lands at the opening remained part of the reservation. Instead it is our judgment that the then unallotted lands lost all reservation status, became part of the public domain, and not within the reservation for any purpose when the reservation was opened, subject only to the special tracts herein discussed set apart for specific uses before the land was opened, and subject to valid mineral claims specifically provided for in the Acts of 1902, 1903, 1904 and 1905 and valid claims made under the general mining laws.
 
 
 108
 IT IS SO ORDERED.
 
 
 109
 WILLIAM E. DOYLE, Circuit Judge, will write a separate dissenting opinion.
 
 
 110
 WILLIAM E. DOYLE, Circuit Judge, dissenting.
 
 PRELIMINARY STATEMENT DISCUSSION OF ISSUES
 
 111
 I respectfully dissent, particularly with respect to the decision determining that the Uintah lands have become a part of the public domain. In essence, I favor the position that was taken by the District Judge Jenkins, who generally ruled that the Uintah Reservation and its lands remain the property of the tribes that are involved. I would, however, reverse the trial court's determination that the withdrawal of the Uintah National Forest means that the Indians lost title to that land.
 
 
 112
 The trial court recognized that concurrent with the drive to open up the Uncompahgre Reservation there was also an effort to negotiate an agreement with the Uintah and White River bands. Ute Indian Tribe v. State of Utah, 521 F.Supp. 1072, 1111 (D.Utah 1981). This was short of a return to the public domain. It would have provided for the allotment of their lands and for the cession of the unallotted surplus acreage. Bills were introduced in Congress in 1894 providing for the allotment and opening of both reservations. In fact contained in H.R. 6557 there were provisions included in the Indian Appropriations Act for 1894 Secs. 20-23. But it is important to note that under the provisions of the Act distinction was made between the legislative approach to the Uncompahgre Reservation and the approach to the Uintah Valley Reservation.
 
 
 113
 With respect to the Uncompahgre Reservation a commission was appointed to proceed directly with the allotment of the Uncompahgre lands but a separate provision treated the Uintah Reservation Indians. The commission was directed in section 22 to negotiate with those Indians "residing upon the Uintah Indian Reservation, in the Territory of Utah, for the relinquishment to the United States of the interest of said Indians in all lands within said reservation not needed for allotment in severalty to said Indians." The object was merely to obtain the consent of such Indians to such relinquishment and for the acceptance by said Indians of the allotments and severalties of lands within their Reservation. The commissioners were directed to report on an agreement made by them with the Indians which agreement would become operative only when ratified by Act of Congress.
 
 
 114
 It was said in the House report that: "The rights of the Indians on the Uintah Reservation differ from those of the Indians upon the Uncompahgre Reservation. The Uncompahgre Indians have no title to any of the lands within the reservation, nothing more than the privilege of temporary occupancy." House Report, No. 660, LD30, at 1. The Indians of the Uintah Reservation, the Assistant Attorney General found, were the owners of the land within the Reservation because in the Act of Congress of May 5, 1964 a provision was made that the land within the Uintah Reservation should be " 'set apart for the permanent settlement and exclusive occupation of the Indians' ... to make available for settlement any portion of the lands within the Uintah Reservation." Id., at 2-3. The report said: "it is first necessary to obtain the consent of the Indians residing thereon."[1] The bill provided that the commissioners appointed "shall treat with the said Indians for the purpose of obtaining a relinquishment of their title to any lands not needed for allotment to Indians." The Supreme Court in Mattz v. Arnett, 412 U.S. 481, 496, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92 (1973) made it plain that the effort in the opening of the reservation in that case was not to do away with the continued reservation status. The object was to arrange for a system under which Indians could own land on the reservation with the federal government acting as guardian and trustee for the Indians which would be regarded as beneficial to the development of its wards.
 
 
 115
 In contrast to this, as to the Uncompahgre Reservation which was directly south of the Uintah Reservation, the object of Congress was particularly vague. However, the first duty of the Commission was to deal with the Uncompahgre Indians according to the Act of 1894. Actually the work of the Commission, shown by the report of the Senate, did not make any progress at all with respect to the Indians of the Uintah Reservation. The majority in the present appeal feel that Congress was aware that the reservations were to be terminated by legislation that expressly restored the Indians' land to the public domain. The legislative history of the 1905 Act showed that as to the Uintah Reservation the Senate purposely voided the earlier acts which would have affected the Reservation and rejected the 1905 House proposals that contained express "restored to the public domain" language. Thus the 1905 Act has to be read as opening the Reservation in only a limited way. Since there was no intent to terminate it entirely, no such intention was shown, hence it cannot be implied.
 
 
 116
 The majority opinion disagrees with the trial court's extensive consideration of the 1905 Act's basic objective. The majority opinion argues that the Act's development was merely an extension of the original 1902 Act and did not repeal the earlier legislation. Thus the 1902 Act's termination language ought to apply to the Uintah Reservation. In actual practice it never was so regarded by the Congress or by the Department of Interior. Meanwhile 80 years passed since the enactment and no change has been made to this day.
 
 
 117
 The majority opinion also has cited other Indian reservation cases decided by the Supreme Court. The majority opinion states that the operative language in the 1905 Act opening the Uintah's land to non-Indian settlers, "under the homestead and townsite laws," is equivalent to "restored to the public domain;" the only phrase that the Supreme Court has recognized as terminating reservations that were not expressly ceded by a tribe. I submit that a proper reading recognizes a vast difference between restoring land to the public domain and a partial opening of the Reservation for homestead and townsite purposes. The slight opening here was for homestead and townsite purposes. Neither the Reservation or its lands generally were disturbed. I have no criticism of the Act of Congress which opened the land to non-Indian settlors for homestead purposes; this is consistent with continuation of the Reservation identity as well as the unallotted lands. Here there was no intention of Congress to deprive the Indians of their land.
 
 
 118
 It is highly significant that the position taken in this case by the United States and the State of Utah support the position of the Indians in this legislation. I regard this as highly cogent. If the Uintah Reservation were ripe for return to the public domain the Government would not be arguing in favor of the Ute tribes.
 
 
 119
 The only litigant in this case which takes issue with the position of the Tribes is the cities and counties. This is due to the fact that there are two cities which have grown up within the boundaries of the Reservation. The presence of these cities and counties is insignificant with respect to the issue which is here being considered. They have no minimal standing to try to strip the Tribes of their land.
 
 
 120
 This present action does not seek to interfere with the mentioned cities and counties. These are individual modifications but they go no further than the two counties and the two cities within the counties. Once again the State of Utah has also fully endorsed the position of the Tribe in this case. The State of Utah chose to submit the trial court's opinion as its brief rather than make "unsupportable arguments" against that decision.
 
 
 121
 What is at stake then in this appeal is jurisdiction, civil, criminal, regulatory and taxation, over Indians and over non-Indians who have transactions with Indians in the disputed lands, together with the authority of the United States to administer the area and part of the Uintah Reservation. See DeCoteau v. District County Court, 420 U.S. 425, 427 n. 1, 95 S.Ct. 1082, 1084 n. 1, 43 L.Ed.2d 300 (1975).
 
 
 122
 Indian country has been defined as dependent Indian communities; the State of Utah may have had jurisdiction over the predominantly non-Indian communities of Duchesne and Roosevelt even though, in the trial court's decision, they would be geographically located within the Uintah Reservation. 18 U.S.C. Sec. 1151(b) (1976); Weddell v. Meierhenry, 636 F.2d 211, 213 (8th Cir.1980), cert. denied, 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981).
 
 
 123
 The important point is that, other than the two cities and counties mentioned, the remainder of the property that is in dispute here has had continuous recognition as Indian country and it continues to be so recognized. The majority opinion also recognizes that the Indians who reside in this area have certain claims, even though some of them are not members of the Uintah Tribe, but the Tribal members have claims to tracts for grazing, etc. The allotments made to individual Indians totals about 360,000 acres. There are about 217,000 acres which have been restored to the Indians in 1940. A fact that is recognized by the trial court is that the Hill Creek extension of about 500,000 acres is recognized as the property of the Indians. So, the fact that there have been homestead rights to non-Indians within the Reservation cannot be regarded as too significant in relationship to termination of the reservation or the tribal lands. The majority opinion recognizes that the reserves and the allotments have at all times been referred to as being within the Ute Reservation or the Uintah and Ouray Reservation "and this explains the occasional use of the terms when additions were made extending the Reservation or the Reservation boundaries."
 
 
 124
 Other cases in which courts have upheld a reservation's continuing existence have had far stronger indications of congressional intent to end the reservations on the face of the opening acts than are present in our case. Here there is a dearth of such evidence. In Confederated Salish & Kootenai Tribes v. Namen, 665 F.2d 951 (9th Cir.1982), sections in the opened lands were reserved for schools. That action did not indicate any intent to return to the public domain. The Ninth Circuit denied the kind of relief which is sought here. This partial assumption of control did not terminate the Reservation. There was not a return to the public domain. See Rosebud, 430 U.S. 584, 611-14, 97 S.Ct. 1361, 1375-76, 51 L.Ed.2d 660 (1977).
 
 
 125
 This is another indication that Congress is at liberty to provide for other uses of the land within the Reservation without disturbing the Reservation as a legal entity.
 
 
 126
 In Kootenai Tribes opening legislation also extended a federal ban on liquor to the opened lands; something Congress would have thought necessary if it intended to terminate the Flathead Reservation because the Indians then could no longer have been in "Indian country" where intoxicants were automatically banned. Id. Notwithstanding this evidence of Congress' intent to end the Flathead Reservation, the absence of express termination language on the face of the act together with the lack of cession agreement, convinced the Ninth Circuit that the reservation had not been disestablished. 665 F.2d at 955-56. Circuit Judge Pregerson.
 
 
 127
 Another facial aspect which ordinarily tends to show that Congress intended to terminate a reservation is the provision for a sum certain payment to the Indians for their land. DeCoteau v. District County Court, 420 U.S. 425, 448, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975). A provision to pay all members of the tribe from the uncertain proceeds from future sales of parcels to settlers, however, has indicated that Congress did not intend to terminate a reservation. Mattz, supra, 412 U.S. at 504, 93 S.Ct. at 2257; Seymour v. Superintendent, 368 U.S. 351, 355-56, 82 S.Ct. 424, 427, 7 L.Ed.2d 346 (1962); Ash Sheep Co. v. United States, 252 U.S. 159, 164-66, 40 S.Ct. 241, 242, 64 L.Ed. 507 (1919).
 
 
 128
 The 1905 Act having to do with the Uintah Reservation provided for uncertain payment from sale proceeds rather than a sum certain payment. That is to be regarded as a further indication on the face of the 1905 Act that Congress intended the Uintah Reservation to remain Indian country.
 
 
 129
 The majority consideration, at page 32, discussing the Gilsonite Strip withdrawal as being support for its conclusion that entry limitations are not inconsistent with termination, is plainly misplaced. The Gilsonite Strip Withdrawal Act expressly declares the withdrawn land to be restored to the public domain. Moreover, like the reservation termination in Rosebud, the Gilsonite Strip withdrawal followed the Indians' express cession of that small strip of land for asphalt mining because its barren nature made it useless to them. Act of May 24, 1888, 25 Stat. 157. The majority opinion does not mention this cession. Its references at pp. 23 and 25 to the applicable legislation are not correct. They are at odds with the condition. This was a special withdrawal that was agreed to by the Tribe; thus, there is no possibility of an implicit conclusion that there was a termination of tribal ownership of the remaining land. The trial court ably details the contrast between the tribes' complicity regarding the Gilsonite Strip withdrawal and their steadfast refusal to cede any more of their reservation. 521 F.Supp. at 1113. Without the Indians' cession agreement to provide a baseline purpose of disestablishment, the entry limitations insisted upon by the Senate in 1905 have undeniable significance.
 
 
 130
 In summary: there is nothing on the face of the 1905 Act which supports the conclusion that Congress intended to terminate the Uintah Reservation. In cases involving similarly limited reservation openings of lands that were not expressly ceded by the Indians, the Supreme Court and other circuit courts have held without exception that the opened areas remained Indian country.
 
 Consideration of Legislative History
 
 131
 In Mattz v. Arnett, supra, the Supreme Court acknowledged that Congress has the power to terminate an Indian Reservation unilaterally. Termination, however, does not occur unless the act opening a reservation or that act's development shows the clear intent on the part of Congress to end entirely the land's reservation status. "A congressional determination to terminate must be express on the face of the Act or be clear from the surrounding circumstances and legislative history." 412 U.S. at 505, 93 S.Ct. at 2258. Subsequently, the Court has added that the required clarity of purpose can be disclosed if a tribe's agreement to cede its land is incorporated in a series of acts that show an "unmistakable baseline purpose of disestablishment." Rosebud, supra, 430 U.S. at 592, 97 S.Ct. at 1366.
 
 
 132
 In the present situation there once was an act that showed the intent of Congress to open the Uintah lands and to eliminate the tribe's and the United States's authority over the effected territory. That was the so-called 1902 Act which would have "restored [the Reservation] to the public domain." The catch was that it was subject to a majority of the adult male Uintah and White River Utes giving their consent. Act of May 27, 1902, Ch. 88, 32 Stat. 245, 263-64. This consent was never given. Clearly in 1902 some members of Congress may have considered termination of the Reservation, if the Indians agreed. As opposed to the Uncompahgre's uncertain claim to their lands, the Uintah and White River bands possessed title to the lands within their Reservation. Thus, their consent was seen as a necessary precondition to an opening of that land. See Ute Indian Tribe v. State of Utah, 521 F.Supp. 1072, 1111 (D.Utah 1981). Rosebud is not a parallel situation.
 
 
 133
 At no time did the Uintah and their companion Tribe, the White River Utes, consent to the opening of their Reservation. Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), made Indian cession of reservation lands unnecessary. The Court there held that Congress could unilaterally open and allot reservation lands. Notwithstanding that, unlike the circumstances in Rosebud, supra, which the majority points to as its principal authority, the fact that the tribes here never ceded their lands directly or indirectly means that we cannot legitimately say that there was ever an "unmistakable baseline purpose" to terminate the Reservation.
 
 
 134
 To compare the situation here with that in the Rosebud case in which a majority of the effected tribe first agreed to the proposed diminishment of the reservation, then consistently ratified subsequent revision in the law intending to enact that agreement, is a contrast which argues in favor of the position of this Tribe.[2] For its part, the only changes Congress made in subsequent acts were to "the form of, and responsibility for, payment." 430 U.S. at 595, 97 S.Ct. at 1367. Despite these payment revisions, the original agreement's language which was precisely suited to disestablishment, remained intact in all of the cases that were considered. 430 U.S. at 597, 97 S.Ct. at 1368. The factual contrast between Rosebud and our case is, to say the least, great.
 
 
 135
 Similarly, in DeCoteau v. District County Court, supra, there was a consistent readiness to cede tribal lands which was a key factor. The DeCoteau opinion is relied upon by the majority opinion in Rosebud in support of its conclusion that the Rosebud Indian Reservation agreements showed an unmistakable baseline purpose of disestablishment. To be noted also is the fact that Congress' ratification of the DeCoteau cession agreement states that "All this land is opened by this bill to settlement as part of the public domain." 420 U.S. at 441, 95 S.Ct. at 1091. The finding of termination in DeCoteau was also supported by the fact that there was no indication of a legislative retreat from earlier attempts to vacate a reservation, as in Mattz. And finally in DeCoteau the cession agreement provided for a sum certain payment. 420 U.S. at 448-49, 95 S.Ct. at 1094-95.
 
 
 136
 The trial court considered all of the legislative history in detail and was convinced that "[n]othing in the legislative history of the 1905 Act approaches a clear expression of congressional intent to disestablish the Uintah Reservation." 521 F.Supp. at 1132. That conclusion draws support from the Senate's express rejection of the 1905 House amendment to the 1902 Act which provided that surplus unallotted lands would be restored to the "public domain." As said by the trial court, Senators Smoot and Teller insisted that non-Indians be allowed to enter the Uintah Reservation only under the Homestead and Townsite laws.[3]
 
 
 137
 Congress made a "clear retreat" from its position as expressed in the 1902 Act. As was the case in Seymour and Mattz:
 
 
 138
 The Act did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards."
 
 
 139
 368 U.S. at 356, 82 S.Ct. at 427; 412 U.S. at 497, 93 S.Ct. at 2254.
 
 
 140
 In considering the circumstances surrounding the Uintah Reservation and the subsequent administrative treatment as discussed at quite some length in the trial court's opinion, there is no necessity for us to elaborate on it. We have accurately evaluated the governing authorities. Again, contrary to the conclusions expressed in the majority opinion, there emerges from this study the conclusion that the Indians, non-Indians, the state and federal governments have treated the land as a continuing reservation and not public land. Even if we were to agree with the majority's conclusion that there is "simply no consistent, clear and uniform identification of the reservation's status in the subsequent legislative record," there is ample evidence in the record of the surrounding circumstances in support of the conclusion that Congress never intended to terminate the Reservation or return its lands to the public domain. In any event it is for the cities and counties to prove that Congress had a dismantling intention.
 
 
 141
 The majority quotes the presidential proclamation of July 14, 1905 and states that this proclamation's "references and adoption of the terms of the 1902 Act" shows that the earlier act's termination language was incorporated in the 1905 Act. However, a reading of the 1905 Act fails to bring out this fact nor is there any public domain reference to the Uintah Reservation in that act.
 
 
 142
 Considered in its best light then the strongest part of the majority evidence supports the proposition that any time Congress expresses an intent to restore a reservation to the public domain there would thereupon be an underlying baseline purpose of disestablishment and that furthermore no alteration in congressional intent could come about. Under the majority's view, each change would merely adopt the earlier proposal. The Supreme Court has not accepted any such argument. Moreover property is not to be taken from its owners so easily. The Supreme Court has concluded that congressional intent can change and that we should look to the last expression of that intent to determine whether the Congress that actually opened a reservation meant to terminate it as well:
 
 
 143
 More significantly, throughout the period from 1871-1892 numerous bills were introduced which expressly provided for the termination of the reservation and did so in unequivocal terms. Congress was fully aware of the means by which termination could be effected. But clear termination language was not employed in the 1892 Act. This being so, we are not inclined to infer an intent to terminate the reservation.
 
 
 144
 Mattz, supra, 412 U.S. at 504, 93 S.Ct. at 2257 [footnote omitted].
 
 
 145
 A somewhat similar recent decision was decided by the Ninth Circuit. In the Kootenai Tribes case mentioned above, there was a congressional retreat from an opening act that would have terminated the Flathead Reservation. Confederated Salish & Kootenai Tribes v. Namen, 665 F.2d 951 (9th Cir.1982). But there was a failure in that case to obtain the tribe's consent to cession. Congress had enacted opening legislation which provided that after allotment to the Indians, the surplus lands "shall be disposed of under the general provision of the homestead, mineral, and townsite laws of the United States." 665 F.2d at 957. The obvious differences in Congress' approach in the subsequent act in Rosebud, which "explicitly incorporated, and purported to amend and ratify, a 1901 cession agreement," and in the act which allowed only limited non-Indian settlement on the Flathead Reservation caused the Ninth Circuit to conclude that "it is mere speculation to suppose that Congress in 1904 must have intended to effect a termination simply because it had sought to negotiate one several years earlier." 665 F.2d at 958 [footnote omitted].
 
 
 146
 In our case evidence of subsequent negotiations is not shown. As in Kootenai Tribes, it cannot be said that merely because Congress may have intended to effect a termination, because it had sought to negotiate one once, that it intended to effect a termination in the actual opening legislation. As Judge Pregerson, speaking for the Ninth Circuit, said in the opinion in the Kootenai Tribes case "it is mere speculation". Here also it is speculation at best to suppose that Congress must have intended to effect a termination growing out of the fact that first it sought to negotiate one.
 
 CONCLUSION
 
 147
 From a consideration of the trial court's opinion, we are convinced that it is based on a careful and painstaking review of the relevant legislation and history. The trial court applied principles of law to analysis of the facts in accordance with Supreme Court precedent. I join in the majority's affirmance of parts of the trial court's decision but dissent from all of the remainder of the majority opinion; that which reverses the trial court's judgment that the Uintah Reservation and the lands within it was not terminated by the 1905 Act or any other action. To hold otherwise would run counter to the detailed decision of the trial court and the precedents which favor the Indians. The majority's effort to piece expressions together in order to find congressional intent to terminate is not persuasive. To terminate the Uintah Reservation and return the lands to the public domain on the showing in this record would be an injustice of great magnitude. Actually the only parties who seek to bring about this termination of ownership are the two cities that are involved and no doubt they have motives of their own. It is possible that there are minerals to be mined in this area. However, this dissent grows out of a sincere belief that the Indian Tribes involved are threatened with a gross injustice.
 
 
 148
 Finally, we return to the fact that the United States has never undertaken a termination of this Reservation or Indian ownership of these lands. Throughout its history and at the present time the United States has recognized the continued existence of the tribe and the tribe's ownership of the lands. True, there have been limited modifications allowing entries, none of which have purported to bring about any substantial change. Indeed, even at the present time and in this case the United States has endorsed the Indian position.
 
 
 149
 The United States Government has on this appeal urged an affirmance of the judgment of the district court with the exception of the ruling with respect to the forest lands. This writer views the ruling on the ownership of the forest lands in the same way. It is a condition brought about by the Forest Service (Dept. of Agriculture) undertaking the management of the forest. This has not changed the ownership of the lands or the timber. The important fact is that the United States is on the side of the tribes. This alone is opposed to the existence of any evidences of termination or any prior effort to void the Reservation or to return the land to public domain status.
 
 
 
 *
 Honorable George Templar, United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 This consent in this instance is of real importance because it recognizes that the rights of the Uintah Tribe are substantial and that they actually own the land
 
 
 [2]
 In Article I of the original act opening the Rosebud Reservation the tribe agreed to the following: "The said Indians belonging to the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted." ... See Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 591 n. 8, 97 S.Ct. 1361, 1365 n. 8, 51 L.Ed.2d 660 (1976)
 The majority opinion in Rosebud also notes that: "The written consent of a majority of the Tribe was obtained prior to the 1904 and 1907 Acts, ...; no written consent was obtained prior to the 1910 Act, but the 'practically unanimous' concurrence of the Indians was reported." 430 U.S. at 587 n. 2, 97 S.Ct. at 1363 n. 2 [citations omitted].
 
 
 [3]
 Indian Appropriation Bill, 1906; Hearings on H.R. 17474 before the subcommittee on Indian Affairs, 58 Cong. 3d Sess. (1905). The bill as passed incorporated Senators Smoot and Teller's limited entry provision, not the full entry that the 1902 Act contemplated by seeking to restore the Reservation to the public domain. 39 Cong.Rec. 3522 (1905); see also Remarks of Cong. Howell, 39 Cong.Rec. 1181-82 (1905)